342 So.2d 574 (1977)
STATE of Louisiana
v.
Gary TYLER.
No. 57703.
Supreme Court of Louisiana.
January 24, 1977.
Rehearing Denied February 25, 1977.
*576 Jack Peebles, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Walter L. Smith, Jr., L. J. Hymel, Jr., Thomas S. Halligan, Barbara Rutledge, Asst. Attys. Gen., Melvin P. Barre, Dist. Atty., Norman J. Pitre, Harry J. Morel, Asst. Dist. Attys., for plaintiff-appellee.
SUMMERS, Justice.
The grand jurors of St. Charles Parish returned a true bill on October 21, 1974, charging that on October 7, 1974 16-year-old Gary Tyler committed first degree murder of 14-year-old Timothy Weber in violation of Article 30 of the Criminal Code. By answer to a bill of particulars the State advised that the prosecution would be conducted under Article 30(4) of the Code, which then provided in pertinent part:
"First degree murder is the killing of a human being:
"(4) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person;
"Whoever commits the crime of first degree murder shall be punished by death."
In a trial by jury commencing on November 5, and ending November 14, 1975, a unanimous verdict of guilty of first degree murder was returned. The mandatory death penalty was imposed.
Several weeks after sentence, trial counsel was relieved and appellate counsel was substituted.
After the appeal record was filed here, a motion for a new trial based upon newly discovered evidence was addressed to the trial court on March 10, 1976. On the State's motion, the appeal having divested the trial court of jurisdiction, this Court remanded the case to the trial court on March 18, 1976, for the sole purpose of allowing the trial court to hear the new *577 trial motion, with full reservation of rights to the defense and the State under the appeal then pending in this Court.
Upon remand defendant again filed a motion for a new trial, which was denied on April 28, 1976 after an extensive hearing. On the basis of the reservation of defendant's rights in this Court's order of remand, the defense assignment of error to the trial judge's denial of the motion for a new trial is considered as part of this appeal.

I
In the meantime, before this case was argued in this Court, the United States Supreme Court decided Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). By that decision the death penalty prescribed by Article 30 of the Criminal Code, in effect on October 7, 1974, was declared unconstitutional, the Court holding:
" . . . that the death sentence imposed upon the petitioner under Louisiana's mandatory death sentence statute violates the Eighth and Fourteenth Amendments and must be set aside. The judgment of the Supreme Court of Louisiana is reversed insofar as it upheld the death sentence imposed upon the petitioner and the case is remanded for further proceedings not inconsistent with this opinion."
With this decision as authority, the defense moved in this Court for an order discharging Tyler from custody, alleging that Article 30 of the Criminal Code was now a statute proscribing certain acts with no legal sanction or punishment. The argument is that the Court could not, under these circumstances, order resentencing since no rational statutory basis for punishment existed.
Then, before argument of the appeal on November 10, 1976, this Court, on October 14, 1976, rendered its decision in State v. Jenkins, et al., 340 So.2d 157 (1976). It was observed there that the decision in Roberts v. Louisiana was not the first time decisions of the United States Supreme Court had invalidated this State's statutory capital punishment provisions, referring to Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Each time, as a result of these decisions, this Court was called upon to decide upon the sentences of persons validly convicted, but unconstitutionally sentenced to death. In each case the trial courts were instructed to substitute life imprisonment for the death sentence.
The decision in State v. Jenkins noted, however, that the situation created by the decision in Roberts v. Louisiana differed from that brought about by the Witherspoon and Furman decisions. In responding to the holding in Furman, the Louisiana Legislature, by Act 111 of 1973, enacted new Articles 30 and 30.1 providing classifications for the crime of murder. First degree murder, under this new classification, carried a mandatory death penalty while second degree murder required imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years. Under these circumstances the Court in State v. Jenkins, et al., concluded:
" . . . If this Court chose to follow precisely the course taken in its postWitherspoon and post-Furman decisions-i.e., substitution of simple life imprisonment for the invalid death penaltywe would create an anomalous situation in which the penalty imposed on those validly convicted of first degree murder is less severe than that imposed upon other individuals convicted of second degree murder. Accordingly, we conclude that the appropriate sentence to be imposed upon a valid conviction for first degree murder is the most severe penalty established by the legislature for criminal homicide at the time of the offense, La.R.S. 14:29 et seq., which we may presume to be constitutional in the wake of Roberts v. Louisiana, supra. This penalty is imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years. See La.R.S. 14:30.1, as added by Acts 1973, No. 111, § 1." *578 On the same day, based upon the rationale in State v. Jenkins, this Court arrived at the same result in a number of cases presenting the same issue. State v. Skelton, 340 So.2d 256; State v. Davenport, 340 So.2d 251; State v. McDaniel, 340 So.2d 242; State v. Smith, 340 So.2d 222 and State v. Clark, 340 So.2d 208.
These decisions are, therefore, dispositive of the issue. Tyler's conviction may be affirmed, but the death penalty is unconstitutional and State v. Jenkins requires resentencing in keeping with the formulation of that decision.

II
Another issue is presented by the motion to discharge from custody. It is also a threshold issue, for it involves jurisdiction. The argument is made that because an adult defendant convicted under the first degree murder statute may not be retried or resentenced under the present second degree murder statute, this juvenile defendant may not be retried under the second degree murder statute.
This contention is based upon the premise that the decision in Roberts v. Louisiana, supra, while permitting the conviction to stand, had the effect of abrogating any sentence under the first degree murder statute, thus requiring defendant's discharge from custody. As pointed out in Part I above, this premise is not well-founded. A sentence has been approved in such cases by our decision in State v. Jenkins, supra, and the other cases cited in Part I.Roberts v. Louisiana does not, therefore, require a retrial of defendant under the second degree murder statute, or any other, only a remand of this case for appropriate sentencing.

III
Invalidation of the death sentence by the Roberts decision has the effect, defendant contends, of removing the crime of first degree murder from its classification as a "capital offense", one that may be punishable by death. Thus, the argument proceeds, the Constitution of 1921, in effect on October 7, 1974 (the date of this offense) does not confer jurisdiction on the district court in a noncapital case where a juvenile is involved. Jurisdiction over juveniles is only conferred on the district court "for capital crimes and crimes defined by any law defining attempted aggravated rape if committed by children fifteen years of age or older." La.Const. art. VII, § 52 (1921).[1] See La.Const. art. VII, § 35 (1921).
When the same issue was raised recently in State v. Smith, we held:
"Defendant maintains that when the death penalty was declared unconstitutional, first degree murder lost its status as a capital crime, and he should have been remanded to the custody of the juvenile court. (Cf. La.C.Cr.P. art. 933(2):" `"Capital offense" means an offense that may be punished by death'). The identical issue was raised after Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), struck down the death penalty provision of our prior first degree murder statute, La.R.S. 14:30 (1950). State v. Whatley, 320 So.2d 123 (La.1975).Whatley held that the district court retained jurisdiction over a juvenile charged with first degree murder because `as enacted, La.R.S. 14:30 (1950) constituted a legislative classification that the crime of murder constituted a capital offense, and that conduct punishable by this statute remained a "capital" crime for purposes of Louisiana law (even though Furman held that the death sentence could not actually be imposed or executed.' 320 So.2d at 125. Defendant was charged, tried and convicted for an offense which the legislature classified as *579 `capital,' and Roberts has no bearing upon the jurisdiction of the district court in this matter."339 So.2d 829, 835 (La.1976).
That holding was considered dispositive of a similar issue raised in State v. Moore, La., 340 So.2d 1351, decided December 13, 1976. See also State v. Whatley, 320 So.2d 123 (La.1975).
By the view we have taken of the issues presented in the motion to discharge if this conviction is affirmed, the final contention that the juvenile court may not exercise jurisdiction over the defendant is rendered moot. This is so because if defendant's conviction is affirmed he will not be tried again, only resentenced in the court of his conviction.
Having resolved the issues raised by the motion to discharge from custody, we now turn to the assignments of error the defense presents for our consideration on appeal.

IV
A defense motion to quash the indictment was filed on June 10, 1975, wherein it was alleged that plea bargaining with the District Attorney was impossible under the law which prevents him from accepting any plea on this first degree murder charge. Thus, it is alleged, defendant, as a juvenile, is compelled to stand trial on the charge of first degree murder, for, if he should plead to a lesser offense, the district court would lose jurisdiction; whereas, plea bargaining is available to an adult who may plead to a lesser offense without divesting the district court of jurisdiction. This unfair, unjust and discriminatory treatment of the juvenile, defendant contended, violates constitutional due process, and the indictment should be quashed.
The motion was heard and denied on June 17, 1975, the day before the case was set for trial. By application for certiorari, defense counsel sought review of the ruling in this Court. According to the petition, the question raised by the motion was the constitutionality vel non of the Louisiana law providing for jurisdiction in the district court over children accused of capital crimes. See State v. Tyler, 320 So.2d 558, writ denied October 17, 1975.
In brief the defense notes that the assignment of error relating to this issue presents the same contentions advanced in connection with the motion to discharge from custody. These contentions, having been answered in parts IIII of this opinion, require no further consideration.

V
In order to understand the State's theory of the case, and the defense contentions in this part, a statement of the relevant facts is needed. On Friday evening, October 4, 1974, a racial disturbance occurred at a Destrehan High School football game. When classes resumed the following Monday, October 7, 1974, evidence of racial hostility again erupted. The morning was marked by general turmoil, fighting, stabbing and other acts of violence. Because of this, school officials decided to close school early and send all students home. Early that afternoon school buses were called out and students embarked in those which were headed in the general direction of their homes.
Earlier that morning defendant Tyler had been suspended from school. He was picked up later during the day with a companion on a road leading to the school by a Deputy Sheriff who suspected they were truants. The Deputy Sheriff brought them to school to verify his suspicions. He learned of Tyler's suspension, and because of the disturbances then in progress at the school, Tyler was instructed to go home immediately. Accordingly, Tyler embarked in bus 91, which was loaded with other black students bound for the St. Rose area.
As the bus drove away from the school grounds, it was necessary to pass groups of white students assembled along the school driveway and along the edge of the street leading from the school. While those assembled along the bus route were mostly students, some parents and relatives of students, who had come for their children, *580 were also included. In all 100 to 200 whites were assembled.
Among those gathered in the crowd just outside the school grounds were Timothy Weber, a freshman high school student, his mother and Roland LaBranche. As the black students in a school bus ahead of bus 91 passed by, a wine bottle was thrown from the bus into the crowd of white students alongside the street just outside the school grounds. A container of powder was thrown from the next bus of black students going that way. Some of those alongside the street tried to throw it back at the bus. These actions were accompanied by the jeering and shouting of blacks and whites.
As bus 91 proceeded past the crowd, jeering and taunting between blacks and whites continued, and rocks and shells were thrown at the bus. Then, two gloved hands protruded from a right rear window of the bus, holding a .45 caliber automatic. The gun was fired into the crowd gathered within six feet of the bus. A bullet struck Timothy Weber, entering his head, and having penetrated his neck continued until it struck the arm of Roland LaBranche who was standing behind him. As a result Weber was mortally wounded and died several hours later. LaBranche received a flesh wound. According to the State, investigation disclosed that Natalie Blanks was sitting near Tyler. She saw him raise the window, fire the shot and then hide the gun in a seat cushion on the bus.
These facts are relied upon by the State to support its theory that Tyler killed Weber by firing at point blank range into a crowd with intent to kill or inflict great bodily harm upon more than one person. La.Crim.Code art. 30(4).
The prosecutor, in his opening statement and in his closing argument, and the judge in his charge to the jury, approved as relevant to this case the legal presumptionrecognized by Section 432 of Title 15 of the Revised Statutesthat the defendant intended the natural and probable consequence of his act.
In brief defense counsel concedes that trial counsel made no objection when the prosecutor referred to this presumption as applicable to the instant case, or when the trial judge charged the jury that the law presumes that the defendant intended the natural and probable consequences of his act. In addition, the trial judge informs this Court by his per curiam that trial counsel had a copy of the charge and was given an opportunity to study it well in advance of its delivery to the jury. Furthermore, defendant's trial counsel indicated to the judge that the charge was fair.
The issue presented is resolved by Article 841 of the Code of Criminal Procedure:
"An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
"The requirement of an objection shall not apply to the court's ruling on any written motion."
Despite the defense concession that no objection was made at the trial, and notwithstanding the per curiam of the trial judge to the effect that trial counsel indicated that the charge was fair, it is contended on this appeal that the Court may not invoke the rule of Article 841 in this case. This contention is based upon the theory that charging the presumption relieved the State of the necessity of proving beyond a reasonable doubt an essential element of the crime-that is, specific intent to kill or to inflict great bodily harm upon more than one person as Article 30(4) of the Criminal Code requires. For this reason, it is claimed, charging the presumption offends Fourteenth Amendment guarantees of due process and Section 271 of Title 15 of the Revised Statutes, imposing the burden of proof upon the State to prove beyond a reasonable doubt every fact and circumstance *581 necessary to constitute the defendant's guilt. In effect, the contention is that the technical requirements of Article 841 must succumb to these constitutional and statutory guarantees invoked by defendant.
A similar contention was presented in State v. Marcell, 320 So.2d 195 (La.1975), at which time the issue was resolved in these words:
"Notwithstanding the foregoing, counsel for defendant argues that under the provisions of Article 1, § 19 of the Louisiana Constitution of 19742 defendant is
2 Article 1, § 19 provides in pertinent part:
`No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. This right may be intelligently waived.'
entitled to a review of his assignments of errors despite the failure of trial counsel to object at the time the alleged errors occurred. Defendant interprets Article 1,§ 19, guaranteeing a defendant the right of review unless the defendant intelligently waives that right, as meaning that a defendant does not lose his right to a review of trial errors unless he knowingly and intelligently waives his right to object or his right to demand a mistrial. He cites Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) for the proposition that an accused should not be presumed to have exercised a deliberate choice because of silence or inaction, and Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972) for the proposition that a waiver must be the product of an understanding and knowing decision of the accused himself, who is not necessarily bound by the decision or default of his counsel.
"Because Barker involved an alleged waiver of the right to a speedy trial and Humphrey a waiver of state remedies such as would bar federal habeas corpus relief, we do not find those cases dispositive of the issue with which we are here concerned. We would apply the principles of waiver expressed in Barker and Humphrey if in the instant case defendant were before us seeking an out of time appeal, arguing that while his counsel may have failed to take the proper steps to perfect an appeal, he himself had not intelligently or knowingly participated in that decision or neglect. We read Article 1, § 19 of the Louisiana Constitution of 1974 as establishing the right to an appeal and as conferring on the accused, and the accused alone, the right to waive this right. But it is apparent that defendant in the instant case has been afforded his right to appeal. His conviction is properly before this Court for appellate review, and we have reviewed his conviction insofar as Art. 841, C.Cr.P. allows.
The problem is thus not that defendant is being denied the right to an appeal, but that the extent of this appellate review has been limited by the failure of his trial counsel to object to alleged errors occurring during trial.
"The contemporaneous objection rule, as embodied in Article 841 of the Louisiana Code of Criminal Procedure, is necessary in order to promote judicial efficiency and in order to prevent a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors that might easily have been corrected by objection at trial. The rule is a reasonable one when viewed in light of the Sixth Amendment right to counsel, for an accused is not forced into a trial to fend for himself, but is instead afforded the opportunity to be represented by counsel trained in the intricacies of the law. While an accused may easily be informed of or educated in some of his fundamental rights and options, such as the right to assistance of counsel, the right to a speedy trial, and the right to exercise the privilege against self-incrimination, such education is not possible when it comes to the intricate and numerous rules governing trial by judge or jury. Consequently, during the course of trial, a defendant must rely upon his counsel, and the acts and choices of counsel are deemed to be those of the defendant himself. Where it appears that counsel has failed in his professional duty *582 toward a defendant, our system affords a defendant relief through a writ of habeas corpus alleging incompetent or ineffective counsel, in effect the deprivation of the right to the assistance of counsel. Competence or incompetence of that counsel is not before us in this appeal.
"We conclude, therefore, that Article 841 of the Louisiana Code of Criminal Procedure does not violate Article 1, § 19 of the Louisiana Constitution of 1974. While the constitutional provision does afford each defendant the right to judicial review based upon a complete record of all evidence upon which the judgment is based, the extent of this right is circumscribed by reasonable procedural formalities and requirements, including contemporaneous objections and the filing of assignments of error."
There is no merit to this assignment of error.

VI
Prior to sentencing, defendant filed a motion for a new trial. Therein it is alleged, in part, that the verdict was contrary to the law and the evidence in that the State did not prove that Tyler intended to kill or cause great bodily harm to more than one person, as charged, because the weapon allegedly used by him was a .45 caliber automatic loaded with five shells from which only one shot was fired.
In support of the motion the defense argues that, because only one shot was fired from the almost fully loaded automatic, only one person could have been killed or could have suffered great bodily harm, and the jury could not infer specific intent to kill or harm more than one person from that one shot. There was, therefore, no evidence of specific intent to kill or to inflict great bodily harm upon more than one person, an essential element of the crime defined by Article 30(4) of the Criminal Code. Because there was no evidence of an essential element of the crime, the defense argues, a question of law is presented warranting a review on appeal of the denial of this motion for a new trial. La.Code Crim.Pro. art. 851.
Tyler, according to the evidence produced by the State, shot the powerful .45 caliber automatic at point blank range into a crowd. The bullet passed through Weber's head and neck and continued until it struck LaBranche, who was standing nearby, in the arm. The question is whether there is some evidence, no matter how little, that Tyler intended to kill or harm more than one person. If there is some evidence, this Court may not judge its sufficiency, that is a question for the jury. Jurisdiction of criminal appeals in this court is confined to questions of law. La.Const. art. V, § 5(C) (1974). This Court may not usurp the jury's prerogative and judge the guilt or innocense of the accused. Only when there is no evidence at all is a question of law presented warranting reversal on appeal. La.Code Crim.Pro. art. 858; State v. Humphreys, 319 So.2d 344 (La.1975); State v. Dixon, 316 So.2d 737 (La.1975).
Aside from the recited facts, from which the jury could infer that the requisite intent was present, there is authority in law for the proposition that shooting into a crowd indiscriminately with intent to kill someone is an assault with intent to kill each of them. State v. Thomas, 127 La. 576, 53 So. 868 (1911); Ragar v. State, 180 Ark. 1131, 24 S.W.2d 334 (1930); Scott v. State, 49 Ark. 156, 4 S.W. 750 (1887); 40 C.J.S. Homicide § 82 (1955).
In addition to the logical inference which the jury made from the totality of the circumstances, the presumption exists in law "that the defendant intended the natural and probable consequence of his act,"La.Rev.Stat. 15:432, which in this case was to kill or inflict great bodily harm upon more than one person at the time of killing Timothy Weber.State v. Jordan, 276 So.2d 277 (La.1973).

VII
After trial defendant filed a motion for a new trial based on newly discovered evidence. In connection with this motion, and prior to the hearing thereon, defendant also *583 filed motions for discovery, production and disclosure and a motion to recuse the trial judge from hearing these post trial motions. This latter motion was founded upon an allegation that the trial judge would be a material witness to the issues raised by defendant's motion for a new trial. Defendant assigns as error the denial of the motion to recuse.
Defendant's motion for a new trial alleges that Natalie Blanks was a passenger on bus 91 from which the fatal shot was fired, resulting in Timothy Weber's death. She testified at the trial, according to the motion, that she was near Tyler and saw him open the bus window to fire the shot and hide the pistol thereafter in a bus seat cushion. The motion alleged also that she was induced by threats to so testify at the trial, and she would testify on the motion for a new trial that she did not see Tyler open the bus window to fire the shot; nor did she see him hide the pistol.
Natalie Blanks' affidavit is attached to the motion verifying the correctness of a transcript containing a statement she gave to defense counsel. In that statement she said she didn't know what happened because she didn't see anything. She stated, moreover, that she was coerced by the prosecutors and grand jurors into testifying at the trial in accordance with their version of the facts. Without her direct testimony, the defense asserts, the jury verdict would have been not guilty because the remainder of the State's evidence was circumstantial.
The hearing on the motion to recuse the trial judge was referred to and presided over by another judge.
Sylvia Taylor testified at the hearing that she was attorney for Natalie Blanks during Gary Tyler's trial in November 1975. Before Natalie Blanks testified, Sylvia Taylor spoke to the trial judge, the Assistant Attorney General and Assistant District Attorney regarding the Gary Tyler case. She represented to them that Natalie Blanks had behavior problems, and she requested immunity from prosecution on behalf of her client. The behavior problems were stated to be a tendency to exaggerate and the fact that Natalie had, sometime in the past, received psychiatric help. On this basis, she said, a general consensus was arrived at by those present granting Natalie Blanks immunity from prosecution. The trial judge, she testified, assured her that the agreement would be upheld.
The trial judge took the stand and, after outlining the circumstances surrounding his conversation with Syliva Taylor, he categorically denied that he granted her client immunity or that he had the authority to do so. He denied also that the Assistant Attorney General or the Assistant District Attorney granted immunity, or that any immunity was granted. On this evidence the motion to recuse was denied.
It is the defense contention that denying the motion to recuse placed the defense in a position where the trial judge could not be called as a witness at the hearing on the motion for a new trial because the trial judge was presiding at that hearing.
Article 671 of the Code of Criminal Procedure prescribes that "In a criminal case a jadge of any court, trial or appellate, shall be recused when he: . . .(4) Is a material witness in the cause; . . . ." This article "contemplates and refers to the judge's being a material witness in the actual trial of the criminal cause before the courtnot a witness at a hearing to determine whether he should be recused. "State v. Riviere, 225 La. 114, 122, 72 So.2d 316, 319 (1954). In State v. Kelley, 241 La. 224, 128 So.2d 18 (1961), the court stated that the testimony of the judge must relate to the defendant's guilt or innocence. Under this logical interpretation of the phrase "material witness", the judge would not be recused if he had been called to testify to some matter relating to something other than guilt or innocence. See Official Revision Comment, Ground (4), La.Code Crim.Pro. art. 671.
Defendant's brief submits that a case has been made for recusation under the rule of the Kelley case. This was accomplished, it is argued, when the defense established by *584 Sylvia Taylor's testimony that the trial judge was present when a discussion took place culminating in a grant of immunity to the State's chief witness, Natalie Blanks. Evidence of this grant of immunity prior to trial, the argument proceeds, would have affected the reliability of the testimony of the State's chief witness, for such a grant of immunity was, in effect, a reward for her testimony, creating in the eyes of the jury a bias in favor of the State. Thus the reaction to evidence that immunity had been granted may well have been determinative of the guilt or innocence of the accused.
Initially it should be observed that only the testimony of Sylvia Taylor and the trial judge was heard on the recusation motion. Undoubtedly, the judge hearing the motion to recuse accepted the testimony of the trial judge that no immunity was granted to Natalie Blanks. Because the testimony of these two witnesses was contradictory, the hearing undoubtedly turned on a question of credibility. There is nothing in this record to warrant a reversal of this determination. Therefore, on this finding, there is no basis for an argument that evidence of a grant of immunity at the trial would have affected the reliability of Natalie Blank's testimony, for by the ruling at this hearing no grant of immunity occurred.
This assignment is not well-founded.

VIII
After trial and sentencing, defendant filed a motion for discovery, production and disclosure. The motion was heard in connection with the motion for a new trial and denied by the court.
Production and disclosure of numerous items of evidence, alleged to be exculpatory, are prayed for in this motion. They include grand jury tapes and transcripts, written statements of witnesses, letters, reports, memoranda, investigative reports, police records, oral information alleged to be given to law enforcement agencies, and summaries of tests conducted by employees of the State relating to the presence of nitrite on the gloves worn by defendant at the time the fatal shot was fired. Production and disclosure were also sought of any evidence in the possession of the State tending to establish the innocense of the defendant, or which may be used in mitigation of sentence.
The State answered that the record of the trial would demonstrate that most of the requested information was previously made available to the defense, including a copy of the grand jury transcript, copies of tests on the gloves, and a complete copy of the transcript of the trial proceedings containing the requested information.
Relying upon this Court's decision in State v. Ball, 328 So.2d 81 (La.1976), the State denied that defendant was entitled to any other reports, memoranda or working files of the District Attorney. In that case we held:
". . . Just one year ago, with only one justice concurring, this issue was squarely met by the Court in State v. Collins, 308 So.2d 263 (La.1975), where it was held:
"As a general proposition the State is not required to produce the physical evidence it intends to use at the trial. Exceptions to this rule have recognized the right of a defendant to view and copy his written confession in the possession of the prosecutor,State v. Dorsey, 207 La. 928, 22 So.2d 273 (1945); to obtain production of a taped confession, State v. Hall, 253 La. 425, 218 So.2d 320 (1969); or some of the confiscated narcotic evidence in a narcotic prosecution, State v. Migliore, 261 La. 722, 260 So.2d 682 (1970). When proper allegations support a finding that the defendant acted in self-defense and specifies that the weapon sought was used by the alleged victim against the defendant, supporting a claim of self-defense, we have required production of the weapon by the State v. Woodruff, 281 So.2d 95 (La.1973)."
Defendant's trial attorney testified at the hearing on this motion that prior to trial he filed a lengthy motion for production and *585 discovery of evidence in the State's possession. The District Attorney's office responded, he said, by making the grand jury testimony available to him. He was also told that copies would be furnished of any part of the grand jury testimony he requested. He did request copies, and they were furnished, especially matters of an exculpatory nature.
And, according to trial counsel, he had free access to the District Attorney's entire file and the grand jury proceeding. He also furnished a full copy of his file to defendant's appellate counsel for use in connection with the appeal and this and other motions related to the motion for a new trial.
The defense assignment of error based on the denial of this motion gives no reference to the record, except a reference to the reasons assigned by the trial judge for denying the motion. Nor does the brief point out the pages of the record which support this assignment. In view of the fact that the voluminous record relating to this motion for a new trial and the related motions, and the trial record, with which these motions are involved, consists of several thousand pages, the Court has been compelled to search through the record to determine whether this motion for production and disclosure is well-founded. See La.Code Crim.Pro. art. 841, 920.
Apparently the thrust of the defense contention in this matter is that the State did not furnish trial counsel with all information in its possession having a bearing upon Natalie Blank's claim that she was kidnapped about six months prior to the October 7, 1974 killing of Timothy Weber. When Natalie did not return home on that occasion, her mother reported her missing to the sheriff's office. Later when Natalie phoned her mother to come for her in Kenner, the police picked her up and drove her home. This is understood to mean that law enforcement officials had knowledge of the fact that Natalie Blanks had falsely represented to her mother that she was kidnapped. For they knew, in fact, that she had spent the night with a boy friend.
As the argument is understood, if Natalie Blank's falsehood had been brought to the attention of trial counsel, testimony to that effect would tend to affect her credibility as the State's chief witness. This, in turn, would have the effect of exculpating defendant.
Further, the brief sets forth that Natalie Blank's mother and her attorney, Sylvia Taylor, provided the prosecution with information that she had received psychiatric treatment, but this information was not furnished to trial counsel. If it had been, the defense argues, the credibility of Natalie's testimony as chief witness for the prosecution would have been further impaired, thus furnishing additional grounds for exculpating defendant of guilt in this case.
Insofar as Natalie's false statement to her mother on the occasion of her overnight escapade is concerned, it is unreasonable to expect that the prosecution should be held responsible for all the information and knowledge obtained by all law enforcement officials, especially where the information pertains to matters entirely unrelated to the case at hand. Furthermore, it is tenuous indeed to assert that this one occasion on which Natalie lied to her mother would affect the veracity or credibility of her testimony in an entirely unrelated matter.
There is no merit to the contention that Natalie's psychiatric treatment was exculpatory evidence which should have been brought to the attention of defendant's trial counsel. The record indicates that when Sylvia Taylor left the conference with the trial judge, the Assistant Attorney General and the Assistant District Attorney, during which time she sought immunity from prosecution for Natalie, she spoke to defense counsel. Apparently no mention was made at this latter conversation of the fact that Natalie tended to exaggerate and had received psychiatric treatment, facts Sylvia Taylor had just brought to the attention of the judge and the prosecutor. At least defendant's trial counsel could not recall any reference to psychiatric treatment.
It is apparent, also, that the trial judge discounted the representations made to him *586 relating to Natalie's psychiatric treatment. He quite obviously accepted, instead, the credibility of Natalie's testimony at the trial, supported as it was by the fact that her position on the bus at the time of the shooting permitted her to make the observations to which she testified. Most importantly, it was Natalie who pointed out to the sheriff's deputies the hiding place of the pistol used in the shooting.
It is noted, moreover, that it is doubtful under Louisiana law whether the testimony of Natalie's mother relating to the false kidnapping story or Sylvia Taylor's testimony that Natalie had received psychiatric treatment could have been used to attack her credibility. "When the general credibility is attacked, the inquiry must be limited to general reputation, and can not go into particular acts, vices or courses of conduct." La.Rev.Stat. 15:491; State v. Corbin, 285 So.2d 234 (La.1973).
While this motion purports to relate to the motion for a new trial, the issues presented have to do with the failure of the prosecution to produce and furnish to defendant's trial counsel evidence which is said to be exculpatory.
Reference to the first motion for oyer and discovery filed by trial counsel prior to trial discloses only one allegation which is pertinent to the claimed refusal to furnish exculpatory evidence. There defendant moved that the prosecution be required to furnish: "Inspection of any and all evidence to which defendant is entitled under Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1973), which relates not only to the question of innocence or guilt, but to mitigation of sentence." To this allegation the State answered, "This is an attempt to obtain the State's evidence to which the defendant is not entitled."
A second motion to produce exculpatory evidence is more specific. It alleges that defendant had obtained a statement of a witness who was close to defendant when the shot was fired. The statement, according to the motion, exonerated defendant of guilt in the case. The motion further alleges that there were others in close proximity to defendant who had an opportunity to hear and see what defendant's favorable witness heard and saw. Alleging the probability that the police or agents of the State had obtained statements from some or all of these other people, which were favorable to the defendant, defendant sought production of these exculpatory statements.
This second motion to produce exculpatory statements was probably resolved to the satisfaction of the defense, for it is no longer urged, leaving for our consideration the vague and general request contained in the first motion seeking "all evidence to which defendant is entitled under Brady v. Maryland." A pertinent general pronouncement in Brady v. Maryland is that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196 (emphasis added.)
The Brady pronouncement was amplified in Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). There defendant contended that a specific request is not an "indispensable prerequisite" for the disclosure of exonerating evidence by the State and that the defense could not be expected to make a request for specific evidence that it did not know was in existence.
In analyzing the Brady decision in Moore v. Illinois, Mr. Justice Blackmun wrote:
"The heart of the holding in Brady is the prosecution's suppression of evidence,in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."(emphasis added).
After considering the evidence allegedly suppressed, the Court rejected the defense *587 contention, stating, "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." See also State v. May, 339 So.2d 764 (La.1976), decided Nov. 8, 1976; State v. Major, 318 So.2d 19 (La.1975). The import of these decisions is that a defense request is a predicate to invoking the Brady rights. And the implication is that the request should be couched with some degree of specificity, especially where, as here, the State had justifiable doubts concerning the materiality and credibility of the testimony involved.
It will be recalled that the prosecution in the case at bar did give defense counsel full access to its file and to the grand jury proceedings. Now the defense contends that the prosecution is to be held responsible for not revealing self-serving statements of Natalie's mother that Natalie lied. The statements were made at an unrelated time, concerning an unrelated incident and no specific request was made of the prosecution for that information. The same is true of Sylvia Taylor's oral statement to the judge and prosecutors that Natalie had received psychiatric treatment at another time because of other circumstances. In this Court's view the rule of Brady and Moore does not hold the prosecution to this impracticable standard.

IX
According to the defense brief,
"The newly discovered evidence which surfaced in the motion and at the hearing on the Motion for a New Trial, was: (1) the recantation by the chief prosecution witness, Natalie Blanks, of her original trial testimony which had been the only direct evidence linking appellant to the crime charged; (2) the evidence that this same witness had on at least two prior occasions made false accusations and complaints to the police of a very serious nature; (3) evidence that Natalie Blanks and Loretta London Thomas had been pressured into giving information, thus raising the question of its reliability; and (4) evidence, submitted by Donald Files, that Natalie Blank's trial testimony was inaccurate."
Newly discovered evidence is the ground for a new trial urged by the defense. Such a ground is authorized by Article 851 of the Code of Criminal Procedure in these terms:
"The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
"The court, on motion of the defendant, shall grant a new trial whenever:
"(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty."
The legislature admonishes that "Neither the appellate nor supervisory jurisdiction of the supreme court may be invoked to review the granting or the refusal to grant a new trial, except for error of law." La.Code Crim.Pro. art. 858. The article is a particularized application of the constitutional limitation of this Court's appellate jurisdiction to questions of law only. La.Const. art. V, § 5(C) (1974).
This Court cannot pass on the sufficiency of the evidence. When there is some evidence to sustain the conviction, no matter how little, the question of the adequacy is the concern of the trier of fact. State v. Jackson, 253 La. 205, 217 So.2d 372 (1968).
State v. Valcour, 247 La. 450, 172 So.2d 74 (1965), is a case in which newly discovered evidence was alleged to be based upon a change in testimony of a state witness. After trial, these caveats were stated to be appropriate: Applications for new trials when based upon grounds of newly *588 discovered evidence should be received with extreme caution, and it is a legal requirement that a verdict must remain undisturbed unless it is made to appear, in the manner required, that an irregularity has been committed, sufficient to satisfy setting it aside.
Considering these principles as conferring a broad discretion on the trial judge in granting or denying a new trial this Court has held that, where newly discovered evidence is the ground asserted in a motion for a new trial, the denial of the motion must be arbitrary and a palpable abuse of the trial court's discretion to present a question of law reviewable by this Court on appeal.State v. Randolph, 275 So.2d 174 (La.1973).
Review of the newly discovered evidence relied upon by the defense, particularly the recantation by Natalie Blanks of her trial testimony, convinces the Court that the issue was purely one of credibility. While an effort was made to support Natalie's recantation by evidence that she had received psychiatric treatment and had on two occasions made false representations, that corroboration was also regarded as incredible by the trial judge. As already noted, Natalie's testimony at trial was proven reliable by her statement to the police giving the location of the hidden gun. At the same time this fact has the effect of destroying the credibility of her recantation to the effect that she saw nothing related to the shooting. Other evidentiary facts, both physical and testimonial, also support Natalie's trial testimony. The trial judge found that her recantation was due to pressures exerted in the community by Tyler's sympathizers.
Where credibility is involved the trier of fact is undoubtedly better situated to make the determination, and the principles already announced would not permit a finding that he abused his discretion. Experience teaches that recantations of trial testimony should be looked upon with the utmost suspicion. United States v. Johnson, 487 F.2d 1278 (4th Cir. 1973); Larrison v. United States, 24 F.2d 82 (7th Cir. 1928). And, as a legal proposition, a new trial should not be granted on the ground that the newly discovered evidence destroys the credibility of the State's witness. See State v. Brandle, 187 La. 945, 175 So. 628 (1937);State v. Bates, 140 La. 833, 74 So. 165 (1917), overruled on other grounds; State v. Williams, 38 La.Ann. 361 (1886).
Natalie Blanks and Loretta London Thomas, another student in bus 91 at the time of the shooting, testified, purporting to establish that they were coerced to testify according to the State's version of the case. This testimony was unsupported, except for the corroboration by Natalie's mother of her daughter's statement. On the other hand, their testimony concerning the coercion alleged to have been employed to influence their testimony was contradicted by a number of State witnesses.
Natalie's testimony on this question was that the prosecution furnished a sheet of paper to her containing answers she was to give at the trial to the questions propounded to her. She testified that her testimony was based upon a reading of the answers contained on that sheet of paper. This testimony is, to say the least, inconsistent with that gun,"and he saw the dude" with testimony fills 46 pages.
Donald Files was a student at Destrehan High School at the time of this tragic killing. He was in bus 91 at the time. He did not testify at the trial. At the hearing on this new trial motion he testified that another student cried out, "Look at that dude with that gun,"and he saw the "due" with a shotgun standing on a porch outside the bus. At that time he saw Natalie sitting across from him and "she bent down and went up under the seat," "with her hands in front of her eyes." Everyone was "trying to hit the floor." Not long after a shot was fired, and at that time Natalie was on the floor flat on her stomach crying. According to Files she had no opportunity to see who fired the shot. He had not been interviewed by defendant's trial counsel, he said.
*589 This testimony is said to render Natalie Blanks' testimony "inaccurate". Again the issue is credibility of this witness' version of what happened in bus 91 as opposed to Natalie's trial testimony. Furthermore the physical facts support Natalie's testimony and contradict Donald Files' testimony. As an example, Weber was killed by a .45 caliber bullet, not a shotgun. The broad discretion of the trial judge was not abused when he accepted Natalie's trial testimony, which he heard, over the belated testimony of Donald Files, who did not come forward until after trial.
For the reasons assigned, the conviction is affirmed, the death sentence is annulled and set aside, and the case is remanded to the district court with instructions to the trial judge to sentence defendant to imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years.
CALOGERO, J., concurs and will assign reasons.
CALOGERO, Justice, concurring.
While there are several aspects of this case which I find troubling, I do not conclude that there was reversible error committed at the trial.
The trial jury concluded that defendant injured one youngster and killed another when he fired one shot from a .45 caliber pistol out of the window of a bus into a group of people nearby on a sidewalk. Because defendant was a sixteen year old juvenile, the only offense for which he could be charged and tried in the district court at the time was the capital offense of first degree murder, which, pertinent to this incident, was the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. Had he been seventeen or over at the time of the incident, he could have been charged in the district court with the commission of any felony including second degree murder, which in this case would have been the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm.
The circumstances of this case, particularly the discharge of only a single bullet, were facts making more difficult the state's gaining a conviction for first rather than second degree murder. In any event, the state had no choice but to charge first degree murder if it was to expose defendant to greater punishment than juvenile supervision until age twenty-one at a juvenile detention facility such as Louisiana Training Institute. For this reason, defendant was tried for first degree murder, a capital offense.
Louisiana law does not permit this Court to review factual determinations at criminal trials. We may not reverse, absent trial error, if there is any evidence of each essential element of the crime charged. In this case, there certainly was at least some evidence of each element of the crime. Defendant Tyler argues by his motion for new trial that there was no evidence presented at trial that he intended to kill or harm more than one person. When I review the record, I find, as did the majority, that there is at least some evidence of every element of the crime, including the element of intent.
As I view the case, the two major assignments argued are the denial of the motion for new trial on the basis of newly-discovered evidence, and defendant's complaint that the judge's instructions to the jury were incorrect with regard to intent.
With respect to the motion for new trial on the basis of newly discovered evidence, I am convinced that the trial judge, who, from a review of the record, seems to have been extremely fair in his rulings throughout the trial, correctly decided this issue. Perhaps in a given case recantation by a state's witness should prompt a trial judge to grant a new trial; certainly the law gives him that discretion. C.Cr.P. arts. 851 et seq. In this case, however, I do not believe that he was wrong in refusing to grant the motion, principally because the *590 witness' testimony at the hearing on the motion for new trial was incredible, while her trial testimony was significantly more reasonable and more likely trustworthy. In any event, the trial judge's discretion must be upheld in such a matter unless abused, and in my view there was no abuse of discretion in this ruling.
With respect to the second major defense argument, that dealing with allegedly flawed instructions to the jury, defense counsel insists that the instruction misled the jury as to the required proof of intent.
To be found guilty of first degree murder of the type defendant Tyler was charged with, a person must have the specific intent to kill or injure two or more people. R.S. 14:30(4). The trial judge told the jurors this, and read to them the codal definitions of specific and general intent. Then, he chose to give a charge suggested by the state which instructed them that there is a presumption "that the defendant intended the natural and probable consequences of his act." Defendant argues on appeal that the judge's incorporating this statement, linked with the statements about intent in the state's opening statement and closing argument, misled the jurors into thinking that they could find defendant guilty if they found he had Less than specific intent to kill or inflict great bodily harm upon more than one person.
I am inclined to agree with defendant that the charge was erroneous; whether the error was sufficiently prejudicial to require reversing the conviction and ordering a new trial is a closer question. I deem it unnecessary to resolve the latter issue, however, because the error is not subject to our review.
When the judge gave his charge to the jury, defense counsel did not object, protest, or otherwise indicate to the trial judge that he was dissatisfied with the charge, or that the charge was erroneous. Our trial procedures require a contemporaneous objection at the time a trial error is made. C.Cr.P. art. 841. This rule is necessary because not all trial errors are such as are likely to prejudice the outcome of a trial, and counsel is required to make judgments throughout the trial as to when and if to object to a possible error. Often an error might be made which counsel feels tactically should be ignored. That decision, or non-decision, is made with the legal consequence that the failure to object waives the right to raise the issue on appeal. In this case, for whatever reason, retained counsel did not object to the charge that the judge gave to the jury. Our jurisprudence is clear: in order to preserve an error in jury instructions on appeal counsel must have objected to the instructions at trial. He must let the judge know that he feels that the instructions are in error so as to give the judge the opportunity to correct his instructions, should the judge agree they contain a mistake, so that the trial is not wasted and the matter required to be retried because of a correctible error. Implicit also in the rule is that a defendant should not be permitted to gamble for a favorable verdict and then upon conviction resort to appeal on errors that might have been corrected had they but been brought to the judge's attention. Therefore whatever the possibility that the erroneous charge was reversibly prejudicial, this Court is precluded from examining the merit of that claim.
For these reasons, I concur in the majority decision.
NOTES
[1] See also La.Rev.Stat. 13:1570 to the same effect at the time of this offense. However, as revised by Act 337 of 1975, although not applicable to the case at bar, this section now permits the district court to retain jurisdiction when a child is charged with a capital crime, even though the child pleads guilty to, or is convicted of, a lesser included offense; and a plea to, or conviction of, a lesser included offense shall not revest the juvenile court with jurisdiction of such a child.