376 So.2d 300 (1979)
STATE of Louisiana
v.
David D. MARTIN.
No. 62687.
Supreme Court of Louisiana.
October 8, 1979.
Rehearing Denied November 1, 1979.
*301 C. Alan Lasseigne, Houma, for defendant-appellant.
*302 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Francis Dugas, Dist. Atty., John J. Erny, Jr., Asst. Dist. Atty., for plaintiff-appellee.
BLANCHE, Justice.
Defendant, David D. Martin, was indicted by grand jury for four counts of first degree murder in violation of LSA-R.S. 14:30. Trial was held April 3-11, 1978. Defendant was found guilty on each count by a twelve-person jury. Following the sentencing portion of the trial, the jury unanimously recommended that the defendant be sentenced to death on each count. On April 25, 1978, the defendant was sentenced to death on each count of first degree murder.
Defendant assigns nineteen errors as the basis for his appeal before this Court. Assignments 15, 16, 17 and 18 relate to the constitutionality of the death penalty and will be discussed in the sentence review portion of this opinion. Finding no reversible error in either the guilt or sentence portion of the trial, we affirm both the conviction and the sentence.

FACTS
On August 11, 1977, Wayne Melancon, a wireline operator in Houma, Louisiana, picked up the defendant, David D. Martin, and his wife as they walked in the rain. This was the first time Melancon had ever met the defendant. He took the Martins to their home, helped them unload their groceries and visited for a while. Melancon then asked the defendant and his wife over to his house to get better acquainted. The defendant and Melancon went to Melancon's house where they listened to music and Melancon showed Martin his gun collection. Melancon showed the defendant a Colt Python .357 Magnum pistol with a four-inch blue steel barrel which he kept hidden under the mattress of his bed. The gun was loaded with hollow point bullets which had been modified by Melancon by cutting an "X" across the bullet points in order to give them more knock-down power.
While it is unclear, the evidence also indicates that the evening of August 11 was the first night the defendant's wife went to work at the Black Gold Restaurant and Lounge, which was owned by Bobby Todd. The second night of her employment she had sexual relations with Todd and later informed the defendant of this fact. That same night, Friday, August 12, the defendant broke into Wayne Melancon's home and stole the Colt Python .357 Magnum which Melancon had showed him the day before.
On Saturday, August 13, the defendant visited Raymond Rushing, his next door neighbor, showed him the gun and told Rushing he was going to shoot Bobby Todd. Rushing testified that the defendant said he was jealous because his wife was working at the Black Gold.
On Sunday morning, August 14, the defendant went to see Chester Golden. He told Golden that his wife was working at the Black Gold and would not quit. Martin also stated that he and his wife were going to split up and he was going to leave for Texas. The defendant also said he had a bone to pick with Bobby Todd and if he ran into Todd there would be trouble. Martin informed Golden that he had been up the last two nights waiting outside the Black Gold so that he could get Bobby Todd. He said he had been unable to do this, however, because there were always people around Todd at the Black Gold and he wanted to get him alone. Martin mentioned that it might be impossible because Terry Hebert was always with Todd.
The defendant showed Golden the Colt Python .357 Magnum revolver and told Golden he had stolen it from a convicted felon. Martin said he did not believe the man would report the gun stolen because of his status as a felon. The defendant asked Golden if he knew of a store that was open where he could purchase some ammunition to use to go target shooting. Eventually, after Martin had been unsuccessful in locating any stores open that could sell him the bullets, Golden arranged for Martin to purchase a box of reloads from a man named Tommy Ledet.
*303 Around 5:00 P.M. on the same day, Martin brought his wife by Todd's trailer which was located directly behind the Black Gold. A woman answered and told Mrs. Martin that Todd was asleep. Martin and his wife then left and had supper, where they split a pitcher of beer. Around 7:00 P.M. the defendant dropped his wife at home, telling her he was going to return to its owner the borrowed automobile that they had been driving.
Instead, he returned to the Black Gold. He parked his car down from the place so that he would look like a hitchhiker. He went to the trailer, knocked and asked if he could speak to Bobby. One of the victims allowed the defendant to enter the trailer. Todd walked into the room toward the defendant. As he did, Martin pulled the .357 Magnum from under his shirt. Todd offered the defendant two rolls of money which he produced from his pocket believing the defendant to be a robber. Martin responded that he did not want Todd's money, he just wanted Todd to know his name. He then shot Todd twice in the chest. Martin then proceeded to shoot the other three persons who were also in the trailer: Terry Hebert, Anne Tierney and Sandra Brake.
The evidence regarding the exact sequence of events after Todd was shot is sketchy. The defendant told Pamela Wilson that he shot Terry Hebert next and then the two women. The autopsies revealed that Terry Hebert had been shot five times in the back and side, two shots having pierced his heart; Sandra Brake was shot twice in the heart and had defensive wounds on her wrist and arm; Anne Tierney was shot six times, once in the chest, four times in the abdomen and once in the face. The defendant related to Chester Golden that he had shot one of the girls in the stomach and that she would not die. He said she told him she was hurting and begged him to kill her, to finish her, so he shot her in the head and finished her.
There were a total of at least fifteen shots fired. Since the defendant was carrying a six-round revolver, he was required to stop and reload twice during the shooting. After the shooting, the defendant took the rolls of money to make it look like a robbery. He threw the pistol and the money in a nearby bayou.

GUILT

Assignment of Error No. 1
By this assignment the defendant claims the trial court erred in failing to grant a motion in arrest of judgment on the grounds that the indictment was defective. Counsel for defense argues that the failure of the State to include in the indictment the aggravating circumstances on which it would rely in seeking the death penalty is fatal to the indictment.
At the time the offense was committed, first degree murder was defined simply as the "killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." LSA-R.S. 14:30 (La.Acts 1976, No. 657) The definition of the crime did not include any of the aggravating circumstances contained in Code of Criminal Procedure Article 905.4. Consequently, none of the aggravating circumstances set forth in the capital sentencing procedure were essential elements of the crime of first degree murder at the time of the offense in this case. Therefore, even if we were to accept defendant's argument that in cases where the aggravating circumstances form an essential element of the crime[1] the State is required to include them in the indictment, it would not benefit the defendant in this case since at the time of the crime the aggravating circumstances in Article 905.4 were not "essential facts constituting the offense charged." LSA-C.Cr.P. art. 464.[2]
*304 Corollary to the question raised by the defendant above is whether a defendant is entitled to pre-trial notice of the aggravating circumstances the State will rely on in seeking the death penalty at the sentencing portion of trial. Unquestionably, the need for reliability in the determination of whether to impose the death penalty by adversary proceedings demands that an accused be afforded full rights of due process. Accordingly, a defendant is entitled in a capital sentencing proceeding, no less than in the guilt or innocence trial, to be informed of the nature and the cause of the accusation against him, LSA-Const. Art. 1, § 13. Thus, the defendant is entitled to know the aggravating circumstances which the prosecution will seek to prove sufficiently in advance of court proceedings so that a reasonable opportunity to prepare will be afforded.
Our capital sentencing law does not provide a special provision by which the defendant can discover which aggravating circumstances the State will rely upon in seeking the death penalty. However, we believe the legislature intended that the State be required to disclose the aggravating circumstances on which it will rely when the defendant files a bill of particulars under Code of Criminal Procedure Article 484 requesting the same.
Since the defendant does not allege he was unaware of the aggravating circumstances on which the State would rely and the record is devoid of any evidence that the defendant filed a bill of particulars seeking to discover the same, we find this claim to be without merit.

Assignments of Error Nos. 2, 3, 4, 9 and 10
By these assignments of error defendant contends that the trial court erred in refusing to permit inspection of the grand jury testimony of State witnesses.
Defendant filed motions before, during and after trial to obtain the grand jury testimony of all of the State's witnesses or, alternatively, requesting the trial court to conduct an in-camera inspection of the grand jury testimony to determine if there were any material inconsistencies between the grand jury and the trial testimony of these witnesses. The trial judge denied these motions.
Defendant's request for a private review of the grand jury testimony runs counter to the well settled practice of keeping testimony before a grand jury secret. See, Note, Use of Grand Jury Testimony to Impeach Credibility at Trial, 18 Loy.L.Rev. 468 (1971-72). LSA-C.Cr.P. art. 434, in pertinent part, provides:
"A. Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury. However, after the indictment, such persons may reveal statutory irregularities in grand jury proceedings to defense counsel, the attorney general, the district attorney, or the court, and may testify concerning them. Such persons may disclose testimony given before the grand jury, at any time when permitted by the court, to show that a witness committed perjury in his testimony before the grand jury. A witness may discuss his testimony given before the grand jury with counsel for a person under investigation or indicted, with the attorney general or the district attorney, or with the court."
Unless the request for grand jury testimony falls under the two exceptions mentioned under LSA-C.Cr.P. art. 434, the testimony cannot be used in Louisiana for cross-examination.[3] *305 State v. Sheppard, 350 So.2d 615 (La.1977); State v. O'Blanc, 346 So.2d 686 (La.1977); State v. Miller, 319 So.2d 339 (La.1975); State v. Devore, 309 So.2d 325 (La.1975); State v. Ivy, 307 So.2d 587 (La. 1975). This Court has also interpreted LSA-C.Cr.P. art. 434 to hold that the testimony of a witness before a grand jury is inadmissible to prove a witness' prior inconsistent statement at trial. State v. Terrebonne, 256 La. 385, 236 So.2d 773 (1970).
Concerning defendant's general request for an in-camera inspection of the grand jury testimony, in addition to violating its traditionally maintained secrecy, it is settled that a trial judge is not required to grant an in-camera inspection in response to defendant's general request. State v. Lewi's, 353 So.2d 703 (La.1977); State v. May, 339 So.2d 764 (La.1976). In the instant case the trial judge found that defendant failed to demonstrate a particular need for the grand jury testimony of any of the State witnesses. Under these circumstances, the trial judge ought not to be burdened with the task of examining voluminous grand jury testimony in order to ascertain inconsistencies with trial testimony. See Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

Assignments of Error Nos. 5, 6, 7, 8
By these assignments of error defendant alleges that the trial court erred in refusing to allow defendant to inspect the written statements of all of the State's witnesses. Defendant made several motions for the production of statements made by each of the State's witnesses to the prosecution prior to trial, or alternatively, that the trial court conduct an in-camera inspection of the written statements of each witness after they testified in order to determine whether they contained any material for impeachment purposes. Defendant did not allege the existence of prior inconsistent statements by any State witness except Mrs. Isabelle Powers, nor did defendant contend that any of these witnesses' pre-trial statements contained Brady material.
Statements made by witnesses to the district attorney or agents of the State are not discoverable. LSA-C.Cr.P. art. 723. See State v. Ball, 328 So.2d 81 (La.1976); State v. Rose, 271 So.2d 863 (La.1973). Moreover, defendant did not lay a proper foundation for impeachment of any of the State's witnesses at trial. See State v. Lovett, 359 So.2d 163 (La.1978); State v. Nails, 255 La. 1070, 234 So.2d 184 (1970).
However, defendant made a specific request for Isabelle Powers' written statements alleging that her statements contained Brady material and would disclose prior inconsistent statements.
Mrs. Powers testified that she made several phone calls to Bobby Todd's trailer on the night of the murders. These phone calls assisted the State in establishing the time of the offense.
Defense counsel insisted that during an informal discovery meeting prior to trial, the State supplied him with information supposedly based on Mrs. Powers' pre-trial statements that one of the phone calls was made at 7:50 P.M. The State denied any inconsistent information was given to defendant. The trial court conducted a short hearing and the district attorneys involved in the pre-trial motions testified that the phone calls discussed at this informal discovery meeting were placed at approximately 7:30 P.M. and 8:05 or 8:10 P.M. and at no time was a 7:50 P.M. call mentioned. Following a short recess called in order for the State to examine its files, the State declared that according to the report of the Lafourche Parish Sheriff's Department dated August 16, 1977, the time span was 7:30 on the second phone call and 8:10 or 8:15 P.M. for the other call. The State disclosed this police report:
"`She stated that she had worked at the Black Gold for some time and that she had at one time lived in the trailer *306 with Bobby Todd. On this night she called the trailer about 7:30 p. m., when she had spoke to Bobby Todd. She said that Bobby had told her he had just awakened and that he had slept some thirteen hours. She also said that Bobby was in good spirits. After talking to Bobby, Isabella said that she had talked to Sandy and that ended the conversation. She had told Sandy that she was going to pick her up around 8:30 p. m. to go to New Orleans for a trip which had been planned earlier. She then called again about 8:10 or 8:15 p. m.' That's the contents of our statements."
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, regardless of the good faith or bad faith of the prosecution. Although there is no duty to provide defense counsel with unlimited discovery, if the subject matter of such a request is material or if a substantial basis for claiming materiality exists, it is reasonable to require the prosecution to respond by either furnishing the information or submitting the problem to the trial judge. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In the instant case defendant's request for information of a pre-trial written statement that was inconsistent with in-court testimony constituted a specific and relevant request and he demonstrated a particularized need. See State v. Harvey, 358 So.2d 1224 (La. 1978); State v. Falkins, 356 So.2d 415 (La. 1978); State v. May, 339 So.2d 764 (La. 1976). The State responded by disclosing the contents of the police report which substantiated Mrs. Powers' testimony at trial. Accordingly, the trial judge's ruling denying defendant the right to inspect the State's files was proper.
These assignments of error have no merit.

Assignment of Error No. 11
Defendant alleges that the exclusion of sixteen veniremen because of their conscientious objection to the death penalty deprived defendant of his right to trial by a fair and impartial jury. LSA-C.Cr.P. art. 798. Additionally, defendant contends that the mandate of Witherspoon was violated because the court did not require the State to question each prospective juror about each aggravating circumstance to insure that there were no aggravating circumstances under which they could vote for the death penalty. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), held that no death sentence can be imposed if the voir dire testimony indicates that the jury imposing or recommending the sentence was chosen by excluding veniremen for cause simply because they voiced general objections to capital punishment or expressed conscientious or religious scruples against its infliction. See also Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).
All of the prospective jurors excused for cause clearly stated that they would vote against capital punishment regardless of the nature of the crime proved. Consequently, all jurors excused for cause in the instant case did not merely express general objections to the death penalty. Rather, they clearly indicated that under no circumstances would they impose the death penalty regardless of the evidence presented by the State. This Court has repeatedly permitted exclusion of such jurors under the language of LSA-C.Cr.P. art. 798. State v. Unger, 362 So.2d 1095 (La.1978); State v. Sheppard, supra; State v. Williams, 343 So.2d 1026 (La.1977); State v. Hunter, 340 So.2d 226 (La.1976); State v. Miles, 339 So.2d 735 (La.1975); State v. Jones, 332 So.2d 466 (La.1976); State v. Rester, 309 So.2d 321 (La.1975).

Assignment of Error No. 12
By this assignment of error defendant alleges that the trial court erred in admitting into evidence clothing seized without a warrant from the home of defendant.
At the motion to suppress hearing, officers testified that on August 15, 1977, defendant's *307 wife agreed to come down to the police station and give a statement. After Mrs. Martin signed the statement, she orally consented to allow officers to search her home. They accompanied defendant's wife to her home in order to search for the clothing that defendant was wearing on the evening of the offense. One officer found a pair of pants and defendant's wife located a shirt and turned it over to the police. Both officers testified that no fear, intimidation, menaces, threats, inducements or promises were used in order to secure Gloria Martin's consent.
However, Mrs. Martin testified that when she gave her statement several officers told her that if she did not quit lying, they would arrest her. She acknowledged that the officers did not threaten to file charges against her if she did not give her consent and that she gave the officers permission to go to her home to search for the clothing. Nevertheless, she maintained that she operated under fear when she gave her statement and consent.
The State then brought in ten deputies, including those officers who had taken Mrs. Martin's statement and those who conducted the search. Mrs. Martin was unable to remember or identify which officers had frightened her. Moreover, the officers specifically rebutted her testimony. After considering the testimony of the witnesses at the motion to suppress hearing including their appearance and demeanor on the witness stand, the trial judge concluded that defendant's wife freely and voluntarily gave her consent and admitted the items of clothing into evidence.
In the case of a warrantless search the burden of proof rests on the State to show that an exception to the requirement of a search warrant is applicable. State v. Franklin, 353 So.2d 1315 (La.1977); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Consent is a recognized exception to the warrant requirement. State v. Lukefahr, 363 So.2d 661 (La.1978); State v. Morris, 340 So.2d 195 (La.1976). Consent of a spouse to search jointly owned and controlled premises permits a warrantless search. State v. Johnson, 343 So.2d 155 (La.1977); State v. Dupuy, 319 So.2d 299 (La.1975); cf. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).
The voluntariness of consent is determined only after a review of the totality of facts and circumstances surrounding the giving of consent. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Temple, 343 So.2d 1024 (La.1977). The trial judge's factual determination as to the voluntary nature of consent to search is entitled to great weight inasmuch as it involves the credibility of witnesses he had the opportunity to hear and observe. State v. Dunbar, 356 So.2d 956 (La.1978); State v. Tennant, 352 So.2d 629 (La.1977); State v. Temple, supra. The trial judge concluded that defendant's wife freely and voluntarily gave her consent to the search. As the officers specifically rebutted Mrs. Martin's testimony and she was unable to identify those officers who allegedly threatened her, the trial judge did not abuse his discretion in finding the consent voluntary.

Assignment of Error No. 13
By this assignment defendant argues that the court erred in denying the defendant's request for a mistrial after a police officer testified that defendant's wife told him that the shirt she gave the officers belonged to defendant, such a statement being hearsay.
After the hearing on defendant's motion to suppress, the clothing was admitted into evidence. Officer Lirette testified before the jury concerning the acquisition of the clothing:
"The blue jean shirt was received by Detective Boudreaux from the wife of Mr. Martin, and the trousers came from a bathroom at that residence, that Mrs. Martin identified as belonging to her husband."
Defendant objected and requested the judge to instruct the jury to disregard the comment. The trial judge complied with the request. Later in the trial, Officer Boudreaux testified:

*308 "This is a shirt we picked up out of the house which Gloria Martin gave to Detective Lirette and said it belonged to David Martin."
Defendant again requested an admonition and the trial judge complied with that request. He then requested a mistrial claiming that such a hearsay statement so prejudiced the jury that an admonition to the jury was insufficient to cure it. The trial judge denied this request.
Defendant contends that he was irreparably prejudiced by this hearsay statement because later testimony by an expert serologist indicated that the shirt had thereon a trace of blood.
Hearsay evidence is testimony in court, or written evidence, of an out-of-court statement offered to show the truth of the matter asserted therein and resting its value upon the credibility of the out-of-court asserter. State v. Martin, 356 So.2d 1370 (La.1978); McCormick on Evidence, § 246 (2d ed. 1972); Pugh, Louisiana Evidence Law, 387 (1974). The traditional exclusion of hearsay evidence is based upon considerations of unreliability and of potential unfairness to the accused to permit the introduction of out-of-court statements which cannot be tested by cross-examination of the out-of-court declarant. State v. English, 367 So.2d 815 (La.1979); State v. Ford, 336 So.2d 817 (La.1976). For these reasons, hearsay evidence is inadmissible in Louisiana criminal trials unless otherwise provided by law. LSA-R.S. 15:434.
In the present case, the statement by Officer Boudreaux was inadmissible hearsay. The trial court admonished the jury to disregard the officer's statement regarding the ownership of the shirt. Mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, see LSA-C.Cr.P. art. 770, is warranted only when trial error results in substantial prejudice to the defendant depriving him of the reasonable expectation of a fair trial. State v. Overton, 337 So.2d 1058 (La.1976); State v. Redfud, 325 So.2d 595 (La.1976); State v. Whitley, 296 So.2d 820 (La.1974). When a prejudicial remark or comment is made by a witness or person other than the judge, district attorney, or a court official, the court may grant a mistrial only if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial. State v. Redfud, supra; State v. Dupuy, 319 So.2d 299 (La.1975).
Examining the record as a whole, the hearsay statement does not appear so prejudicial that a mistrial should have been declared. The State apparently introduced the shirt at trial because the spot of blood was arguably inculpatory since it may have been from one of the victims. However, the victims' blood types were never introduced at trial and the only evidence of blood at the murder scene indicated type O blood. Moreover, the defendant offered evidence that his own blood type was type A, the same as the blood on the work shirt. There did not appear to be a serious dispute that the shirt did not belong to defendant since defendant's wife located the shirt for the police. Although the police officer should not have testified to hearsay, this error probably did not result in a miscarriage of justice, prejudice to the substantial rights of the accused or constitute a substantial violation of a constitutional or statutory right. LSA-C.Cr.P. art. 921.

Assignment of Error No. 14
Defendant contends that the trial court erred when it submitted the following instruction to the jury:
"Evidence of a confession or admission of an accused is considered as direct evidence under the law."
Defendant originally objected when the trial court added to the general charge the statement that a confession or admission of an accused is considered as direct evidence under the law. Defendant objected to this charge arguing that it would amount to a comment by the court on the weight of the evidence and because only testimony of State witnesses established the existence of defendant's admissions.
The record reflects that, following prolonged discussion, the trial judge took special *309 care to alter the suggested charge and that defendant was, in fact, satisfied with the final instruction. Additionally, the jury instruction appears correct. See State v. Snedecor, 294 So.2d 207 (La.1974). Moreover, other instructions by the judge carefully qualified the charge. For example, the trial judge pointed out that it was for the jury alone to determine what has or has not been proven and that the jury had the right to believe or not believe the testimony of any witnesses and the jury was the exclusive judge of the credibility of witnesses. Moreover, after instructing the jury that the corpus delicti must be established, the judge instructed the jury that evidence of a confession, admission or statement of the defendant should be considered in connection with all the other facts of the case and should be given such weight as the jury determined it deserves. Considering the charge as a whole, we cannot say that the trial court erred in its instruction.

Assignment of Error No. 19
By this assignment defendant contends that the court erred when it denied defendant's motion for a new trial based on the discovery of new evidence.
Defendant argues that the discovery by the State of the victims' blood types constituted new evidence of sufficient value that a new trial should have been granted. Defendant's basic argument is that the evidence admitted at trial that type O blood was found on the kitchen counter in the trailer, combined with the discovery after the trial that one of the victim's blood type was O, supported defendant's theory that the victims were killed elsewhere and their bodies transported to the trailer.
The trial court heard the evidence submitted at the hearing on the motion for a new trial and viewed photographs of the crime scene. Based on this evidence, the trial judge denied the motion. In considering a motion for a new trial based on newly discovered evidence, the test to be employed is not merely whether another jury might bring in a different verdict, but whether the evidence is so material that it ought to produce a different result than the verdict reached. LSA-C.Cr.P. art. 851(3); State v. Brown, 338 So.2d 686 (La.1976). The trial judge is given considerable discretion and his ruling on this matter will not be disturbed on appeal unless there is a showing of abuse of discretion. State v. Tyler, 342 So.2d 574 (La.1977); State v. Phanor, 325 So.2d 579 (La.1976).
In the instant case discovery of the victims' blood types was not so material that it would have produced a different result than the verdict reached. The presence of blood all over the trailer, including the walls, weakened defendant's theory that the bodies were moved. Additionally, no other drops of blood were found in a direct line between the victim having type O blood and the kitchen counter, nor were any drops of blood found outside or leading into the trailer. The amount of blood in the trailer as well as the fact that no clotting occurred further supported the theory that the murders occurred in the trailer. Accordingly, the trial judge did not abuse his discretion in denying defendant's motion for a new trial.

SENTENCING

(1) Assignments of Error

Assignments Nos. 15, 16, 17 and 18
By these assignments of error defendant alleges that the trial court erred in denying defense counsel's motion in arrest of judgment on the grounds that the death penalty award is unconstitutional.
Defendant first claims that the death penalty amounts to cruel and unusual punishment in violation of the Constitutions of the United States and the State of Louisiana. The United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and its companion cases, specifically held that in light of historical and contemporary experience, the death penalty is not cruel and unusual punishment per se. Likewise, this Court has taken the position that the death penalty does not constitute cruel and unusual punishment under our State Constitution. Cf. *310 State v. Payton, 361 So.2d 866 (La.1978). We find this assignment lacks merit.
Defendant secondly contends that the death penalty is traditionally inflicted in an arbitrary and capricious manner and, therefore, the infliction of death as punishment in this case deprives the defendant of his rights to due process of law guaranteed to him by the Constitutions of the United States and the State of Louisiana. The thrust of defendant's argument is that Louisiana's present capital sentence statute does not satisfactorily eliminate the possibility that the death sentence will be applied in an arbitrary and capricious manner. We disagree.
The United States Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its companion cases reversed for resentencing defendants convicted by a jury that had unrestricted discretion to impose capital punishment. In Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), and Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the United States Supreme Court held that Louisiana and North Carolina death penalties failed to provide a constitutionally adequate response to the rejection by Furman of unbridled jury discretion in the imposition of capital sentences. Louisiana and North Carolina legislation specified certain situations in which the death penalty would be mandatory. Moreover, the North Carolina legislation was held invalid even though it provided that the jury could recommend life imprisonment in such cases. The United States Supreme Court said that the statute still vested the jury with standardless discretion, i. e., neither the particularized circumstances of the crime nor the accused's character had to be considered.
The Louisiana legislature, after Roberts, enacted our present capital sentence law modeled upon the Georgia statute which was upheld in Gregg, supra. State v. Sonnier, (La.1979) (No. 63,293). Our statute, as Georgia's, provides for a bifurcated determination of an accused guilt and punishment. At the sentencing hearing, the Georgia and Louisiana legislation both provide that the jury must consider whether certain specified aggravating circumstances exist and whether any mitigating circumstances are present. Only one aggravating circumstance need be found under the Georgia and Louisiana legislation to support a sentence of death. Other similarities exist between the Georgia and Louisiana legislation: the jury must specify the aggravating circumstances found; the State Supreme Court must consider as part of its mandatory review whether the sentence was influenced by passion, prejudice, or any other arbitrary factor, whether the evidence supports the finding of statutory aggravating circumstance, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
With regard to the Georgia procedure, the Court in Gregg v. Georgia, supra, concluded:
"The basic concern of Furman centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines. In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that *311 prompted our decision in Furman are not present to any significant degree in the Georgia procedure applied here." (96 S.Ct. at 2940-41)
We believe our statutory scheme provides sufficient protection against the possibility that the death sentence will be applied in an arbitrary and capricious manner. This assignment lacks merit.
Finally, the defendant argues that Louisiana's statutory scheme is unconstitutional because nothing restricts the grand jury's ability to return an indictment for a capital offense, the district attorney's discretion on whether to seek the punishment of death or to charge the defendant on a lesser count, or the jury's ability to find the defendant guilty of a lesser included offense. We find this argument unpersuasive.
In disposing of the same attack on the Georgia statute, the Supreme Court in Gregg v. Georgia, supra, noted:
". . . [T]he petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.
"The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." (96 S.Ct. at 2937)
We find this assignment to be without merit.

(2) Capital Sentence Review
The defendant was tried in accordance with the provisions of LSA-C.Cr.P. art. 905-905.9 (1976), which provides for a bifurcated trial in capital cases. At the conclusion of the sentencing hearing, the jury returned the unanimous recommendation that the defendant be sentenced to death on each murder charge. On April 24, 1978, the trial judge followed the binding recommendation of the jury and sentenced David Martin to death on each of the four counts. Our review below is pursuant to Code of Criminal Procedure Article 905.9 and Supreme Court Rule 28 on Capital Review Guidelines. See State v. Sonnier, supra.

Passion, Prejudice or Arbitrary Factors
Counsel for the defense has not argued to this Court that the sentence was the result of passion, prejudice or any other arbitrary factors. From our independent and thorough review of the record, both of the guilt and sentencing portions, together with the capital sentencing report submitted by the trial judge, we conclude that the sentence was not a product of passion, prejudice or any other arbitrary factor.

Aggravating Circumstances
The jury found the following aggravating circumstances to have existed:
(1) The offender knowingly created a risk of death or great bodily harm to more than one person.
*312 (2) The offense was committed in an especially heinous, atrocious or cruel manner.
The evidence establishes that the defendant lay in wait for Bobby Todd on the two nights prior to the murder. He told Chester Golden that he was having difficulty catching Todd alone because people were always with him, particularly Terry Hebert. The defendant told Raymond Rushing on the day before the murders that he (Martin) was going to shoot Todd. The evidence clearly established that when Martin went to Todd's trailer on Sunday evening, he did so with the intent to shoot Todd. While he told Pamela Wilson that at first he thought Todd was alone, he must have known that Todd was not alone when someone else answered the door and allowed him to enter the trailer.[4] Nevertheless, defendant elected to pursue his plan to kill Todd.
We think the evidence is sufficient to support the conclusion that the defendant murdered the victims one after the other as a part of a single consecutive course of conduct in order to prevent any of the victims from reporting to the police the murders of the others. See State v. Sonnier, supra. Martin told Golden, when asked why he killed the women, that "once I started shooting, there was no stopping." Golden gave this account of defendant's response to his (Golden's) inquiry about how Martin thought he could get away with the murders:
"He said, `I didn't touch anything.' He said, `No one saw me.' He said, `I'll just stick to my story, keep my mouth shut, and I'll get off.' I said, `David, everybody knows you had a grudge against Bobby Todd.' He said, `I figure they will pick me up, but I'm just going to keep my mouth shut.' He said, `They just don't have any proof.'"
In view of the evidence, we believe the act of the defendant is within the interpretation of the statutory aggravating circumstance of "knowingly creating a risk of death or great bodily harm to more than one person" set forth by this Court in State v. Sonnier, supra, also handed down this same day.
Having concluded that the jury correctly found one statutory aggravating circumstance to exist, it was within the power of the jury to consider the death penalty. State v. Sonnier, supra. The requirement that at least one statutory aggravating circumstance be found is to insure that the jury's discretion is "controlled by clear and objective standards so as to produce non-discriminatory application." Gregg v. Georgia, supra, 96 S.Ct. at 2936. We, therefore, deem it unnecessary to inquire whether the jury could have correctly found that the offense was committed in an especially heinous, atrocious or cruel manner.

Comparison with Other Cases
Section 4(b) of Rule 28 of our Court rules requires the district attorney to include in his sentence review memoranda a synopsis of each first degree murder case in the district in which the sentence was imposed after January 1, 1976. The purpose of this requirement is to aid this Court in determining whether the sentence is disproportionate to the penalty imposed in similar cases in the state, considering both the crime and the defendant.
*313 David Martin is a white male, who was twenty-five years old at the time of the commission of the crime. Defendant left high school after his sophomore year but took the G.E.D. test and completed one year of college. The following testimony was offered in mitigation at the sentencing portion of the trial: Donald Culpepper testified that Martin moved to Houma in 1974 and became involved as a counsellor at the Way-Out Help Clinic, a clinic which sought through counseling to help run-away youths and persons with drug problems. He also became involved in various activities at his church. Martin met and married Gloria Pitre, a young woman who had lived with Culpepper and was a patient at the Help Clinic. In December of 1976, a child was born to the couple. The couple desired to have natural childbirth, which would include David Martin assisting in delivering the baby. The reason is not revealed by the record, but the child was born with brain damage. Culpepper and Martin's brother both testified that Martin felt badly about the child's brain damage and somehow blamed himself. Mary Hill testified that Martin and his wife at one time had been house parents at the Whispering Pines Girls Home. She also testified that her bank had lent money to the couple. Testimony at the trial on the merits revealed that Martin's only prior conviction was for driving without a driver's license.
Based on the above evidence, there is no question that the first mitigating circumstance, that the defendant had no significant history of prior criminal activity, is present. The defense has argued that the offense was committed under circumstances while the offender was under the influence of extreme mental or emotional disturbance. The evidence established that a child was born to the defendant approximately nine months prior to the murders, that the child had brain damage and that the defendant somehow blamed himself. The record also reflects that on the second night the defendant's wife worked at the Black Gold (three nights prior to the murders), she engaged in sexual relations with Bobby Todd and related this fact to the defendant. Further, Martin planned to leave his wife, because she would not quit work at the Black Gold, and to return to Texas. Also, evidence indicated that someone had stolen the defendant's car two months prior to the murders. No direct evidence of any mental or emotional disturbance was submitted, however.
The district attorney's capital sentencing report indicates there have been no other first degree murder convictions in that parish since January 1, 1976. Counsel for defense has submitted a list of defendants who were charged with first degree murder and were either allowed to plea bargain to a lesser included offense or were found guilty of a lesser included offense by a jury. Also included are several other cases in which he alleges the elements of first degree murder were present but the defendant was charged with another offense. He claims these cases show a death sentence in this case would be disproportionate since others who could have possibly received it did not because of decisions made during the charging phase or decisions made by juries to return a verdict of a lesser included offense. We find this argument unpersuasive for the same reasons set forth above in answer to Assignments of Error Nos. 15, 16, 17 and 18. (See claim No. 3 therein.)
The defendant was convicted of killing four people in a brutal, savage manner. The evidence showed he lay in wait to kill Todd for two successive evenings before finally getting to him on the third night. Martin killed three people to prevent them from being able to disclose that he was Todd's killer. It is clear from a reading of our Capital Sentencing Law that killing a victim in order to prevent that person from being able to report a separate crime (a kidnapping, an armed robbery, a separate murder, et cetera) is strictly condemned.
We find, therefore, considering both the defendant and the nature of the offense that the sentence is not disproportionate to the penalty which has been imposed in similar cases.

*314 Conclusion
Since we find the assignments of error with regard to the sentencing portion are without merit and further find that the sentence was not imposed as a result of passion, prejudice or other arbitrary factors; the evidence supports the jury's finding of a statutory aggravating circumstance, and the sentence is not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The sentence is affirmed.

DECREE
For the above and foregoing reasons, the conviction and sentence of the defendant are affirmed.
AFFIRMED.
CALOGERO, J., concurs in affirmance of the conviction and dissents from affirmance of the sentence, and assigns reasons.
DENNIS, J., dissents from the imposition of the death penalty upon this defendant, but concurs in the affirmance of his convictions and assigns reasons.
TATE, J., concurs in the affirmance of the conviction, but dissents from affirmance of the capital penalty, for reasons to be expressed in the dissenting opinions of CALOGERO and DENNIS, JJ.
CALOGERO, Justice, concurring in part, dissenting in part.
I concur in the affirmance of defendant's conviction but dissent on the imposition of the death penalty.
This Court is constitutionally required to review a death sentence to determine if it is excessive. Louisiana Constitution 1974, Article I, Section 20, La.C.Cr.P. art. 905.9, Rule XXVIII, Rules of Supreme Court. Among the factors we are by statute compelled to consider in this regard are any and all mitigating circumstances.
Defendant has no significant history of prior criminal activity. His crimes were committed under the influence of extreme mental and emotional disturbances, and under circumstances which he more than likely believed provided a moral justification or extenuation for his conduct. These factors prompt me to conclude that the death penalty is excessive punishment in this case.
DENNIS, Justice, concurring in part and dissenting in part.
I respectfully dissent from the imposition of the death penalty on this defendant but concur in the affirmance of his conviction. The death sentence is excessive in this case.
I. The Evidence.
The state presented evidence tending to establish the following:
A. The Crime.
Two nights after David D. Martin's wife went to work for Bobby Todd at the Black Gold restaurant and bar in Houma she had sexual relations with Todd. She told Martin about the affair and refused to quit her job as he asked. Several days later Martin stole a .357 Magnum pistol from an acquaintance. He told a friend he had the pistol and about his animosity for Todd. Martin waited outside Todd's place of business on two occasions in attempts to find him alone, but both times Todd was in the company of another person.
Shortly before 8:00 p. m. on the night of August 14, 1977, two days after the pistol was stolen, David Martin went to Bobby Todd's house trailer behind the Black Gold. Present at the time were Todd, his assistant, Terry Hebert, and two women, Anne Tierney and Sandra Brake. Martin knocked on the door and was allowed to enter. He pulled out his revolver when Todd approached, and Todd offered him two rolls of money from his pocket. Martin said, "No, I don't want your money, I just want you to know my name," and shot Todd twice. He then killed the other three occupants of the trailer. Two or more bullets were shot into each body, requiring Martin to stop and reload. Terry Hebert was shot in the back as he tried to escape. One of the women was shot in the head when she begged Martin to kill her after he initially wounded her in the stomach.
*315 After leaving Todd's trailer shortly after the killing Martin threw the .357 Magnum in a bayou and went to a friend's house. Guilt-ridden, Martin insisted that his friend drive around with him while he confessed to the crimes. He stated that he had to "tell somebody." However, he was unable to explain why he killed the others after Todd except that he said he could not stop shooting. Although he asked his friend to pledge his secrecy, Martin later the same evening told four other friends and neighbors of the slayings. He asked one of these persons to dispose of two spent cartridges which were later linked to the .357 Magnum that had been stolen from a house in Houma one night after Martin had visited there and seen the revolver.
B. The Defendant.
David D. Martin is a white male who was twenty-five years old on the date of the offense. He was born in Texas and lived in Denver and New Orleans before moving to Houma in 1974. He attended high school through the sophomore grade, passed the G.E.D. test, and completed one year of college. The record contains no I.Q. or psychiatric data. Martin has worked as a carpenter, packing inspector, drug abuse counselor, lay church worker, house parent at a drug abuse clinic, door to door salesman and tacker in a shipyard.
Martin's first marriage ended in divorce. He has an eight year old child by his first wife, but the record does not disclose with whom the child lives. At the suggestion of his sister and friends, Martin came to Houma in 1974 to work in a local drug rehabilitation clinic. There he met and married his second wife who was an out patient at the clinic. About nine months before the offense a baby girl was born to the couple. Martin attempted to deliver the child himself and caused it to suffer brain damage. Martin blamed himself and became despondent. Shortly after this he left his church and his job at the drug abuse clinic and began taking drugs himself. His poor financial condition worsened when his car and two of his paychecks were stolen. It was at this point that his wife informed him of her infidelity and refused to break off her relationship with Bobby Todd.
On the afternoon before the murders Martin borrowed a car and dropped his wife off for work at Todd's trailer. She was informed by a woman in the trailer that Todd was asleep, so Martin took her to get something to eat. During the afternoon Martin drank a pitcher of beer and smoked an unknown quantity of marijuana.
II. Capital Sentence Review
This Court reviews every death sentence to determine if it is excessive. La.Const. 1974, Art. I, § 20; La.C.Cr.P. art. 905.9. In deciding whether the sentence is excessive, this Court determines (a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and (b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Rule XXVIII, Rules of Supreme Court.
A. Aggravating Circumstances
A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the death penalty be imposed. La.C.Cr.P. art. 905.3. The death sentence in the present case is based upon the jury's finding that the State proved beyond a reasonable doubt two aggravating circumstances: (1) The offender knowingly created a risk of death or great bodily harm to more than one person; (2) The offense was committed in an especially heinous, atrocious or cruel manner.
The aggravating circumstance provided by La.C.Cr.P. art. 905.4(d)"[t]he offender knowingly created a risk of death or great bodily harm to more than one person"is similar to those which have been upheld against charges of impermissible vagueness by the Supreme Court. Gregg v. Georgia, *316 428 U.S. 153, 202, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859, 891 (1976); Proffitt v. Florida, 428 U.S. 242, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913, 924 (1976). However, in these cases the high court noted that such a phrase "might be susceptible of an overly broad interpretation," Gregg, 428 U.S. at 202, 96 S.Ct. at 2939, 49 L.Ed.2d at 891, and expressly limited its approval to the statutory language as narrowly construed by the state courts.
This Court in State v. English, 367 So.2d 815 (La.1979), recently construed the plural risk language of our statute in a narrow fashion indicating that an aggravating circumstance should be found "when the single consecutive course of conduct contemplates and causes the knowing creation of great risk of death or great bodily harm to more than one person" and not when "it appears that the defendant intended to commit each murder by a distinct act, that is, by shooting each intended victim individually at short range." Id. 367 So.2d 824.
In the instant case whether Martin's acts of murder should be considered "distinct" or a "single consecutive course of conduct" by which the offender intended to cause great risk of death or harm to more than one person presented a difficult question for the jury. Its decision presents us with an even more abstruse issue: whether the evidence reasonably supports a finding beyond a reasonable doubt that when Martin shot Todd he had formed an intention to seriously harm or do away with all of the occupants of the trailer.[*] There is no evidence that Martin had a motive or design to kill anyone other than Todd. There is very little evidence to indicate that Martin knew other people were in the house trailer when he knocked on the door. His unguarded, apparently spontaneous and remorseful narration of the killings to his friend tends to show that he did not plan to kill anyone other than Todd and that he did not kill the others to eliminate surviving witnesses. Altogether, the evidence does not support a finding beyond a reasonable doubt that Martin actually and specifically intended to create a risk of wholesale death such as an offender who, for instance, shoots into a church congregation or explodes a bomb in an inhabited building.
Other states' interpretations of provisions similar to the aggravating circumstance provided by La.C.Cr.P. art. 905.4(g)"[t]he offense was committed in an especially heinous, atrocious or cruel manner"have been approved by the Supreme Court. Recognizing the arguable proposition that "any murder involves depravity of mind or an aggravated battery" the high court found "no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." Gregg v. Georgia, 428 U.S. at 201, 96 S.Ct. at 2938, 49 L.Ed.2d at 890. In reviewing the Florida Supreme Court's interpretation of its statutory provision as directed only at "`the conscienceless or pitiless crime which is unnecessarily torturous to the victim,'" the high court could not say that the provision, as so construed, provides inadequate guidance. Proffitt v. Florida, 428 U.S. at 255, 96 S.Ct. at 2968, 49 L.Ed.2d at 924.
In State v. English, supra, this Court tacitly adopted the Georgia and Florida interpretations approved in Gregg and Proffitt, recognizing that "any system that seeks to distinguish rationally among murders in terms of heinousness must necessarily incorporate into that concept some idea of torture or the pitiless infliction of unnecessary pain on the victim." Id. 367 So.2d 823. Applying these concepts to the evidence of the instant case we conclude that there was no rational basis for a finding of proof beyond a reasonable doubt that Martin intended to commit a conscienceless or pitiless crime which was unnecessarily torturous to the victims. Accordingly, the jury's finding that the offenses were committed in an especially heinous, atrocious or cruel manner was not sufficiently supported by the evidence.
*317 B. Mitigating Circumstances
There are an unusually large number of mitigating circumstances in this case. A majority of the statutory factors is present.
The defendant David Martin has no significant prior history of criminal activity. La.C.Cr.P. art. 905.5(a). Besides a $10 fine in 1969 for failure to have a driver's license, Martin has no prior criminal record.
The offense was committed while the offender was under the influence of extreme mental or emotional disturbance. La.C. Cr.P. art. 905.5(b). The emotional disturbance brought on by Martin's guilt over the permanent brain damage he inflicted upon his child, his loss of religious faith, his financial reversals, and his wife's open and unrepentant infidelity was in great likelihood extreme.
The offense was committed under circumstances which the offender reasonably believed to provide a moral justification or extenuation for his conduct. La.C.Cr.P. art. 905.5(d). Arguably, of course, there can never be a reasonable belief in a moral justification or extenuation for murder. However, we believe that the statute was intended to be construed so as to allow some slight extenuation for a husband, such as Martin, who is goaded to distraction by his adulterous wifenot an excuse for the crime, of course, but a factor which tends to argue against depicting Martin as a hardened, cold-blooded killer.
At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication. La.C.Cr.P. art. 905.5(e). There was evidence that defendant had consumed a pitcher of beer and smoked some marijuana prior to the commission of the offenses.
The legislature's solemn declaration that the penalty of death shall be just retribution for homicidal offenders whose crimes involve especially heinous, atrocious or cruel methods or the risk of wholesale murder is tempered by procedural and substantive safeguards. The state must prove beyond a reasonable doubt that the offender's act is of the type punishable by the ultimate penalty. Even then, the jury may not legally recommend a sentence of death if the evidence of aggravation is offset by mitigating circumstances to the extent that capital punishment is inappropriate.
In the instant case, David D. Martin stands adjudged of having murdered four people. His crimes are unpardonable and he certainly deserves the severest kind of non-capital punishment. However, the evidence does not prove with the high degree of certainty required by law that Martin's acts were marked by the type of bestiality or misanthrophy which I believe the legislature intended to recompense with death. The jury's finding that the offenses were committed in an especially heinous, atrocious or cruel manner was clearly erroneous. Nor was the proof sufficient that Martin set upon his course of conduct with knowledge that he was creating a risk of death to more than one person. Furthermore, the mitigating evidence clearly offsets the evidence of aggravation so as to make the death penalty inappropriate in this case.
I respectfully dissent also because the majority persists in its refusal to articulate standards of review for errors of fact and law in capital sentence proceedings, and it is evident that the standards applied by the majority in the instant case fall short of the minimum criteria necessary to assure due process of law in the imposition of the death penalty. See my dissenting opinion in State v. Sonnier (La.1979) (No. 63,293.)
NOTES
[1] See State v. Payton, 361 So.2d 866 (La.1978).
[2] Were this a prosecution under State v. Payton, supra, we would, nevertheless, be inclined to reject the defendant's challenge to the indictment. It is well settled in our law that in order to allow an accused the opportunity to prepare for his defense, the indictment must fairly inform him of the nature and cause of the accusation against him. State v. Meunier, 354 So.2d 535 (La.1978); State v. Marmillion, 339 So.2d 788 (La.1976). However, an accused's right to know the nature and cause of the charge against him should not be restricted to mean that he must be so informed by indictment only, because sufficient details may also be supplied by a bill of particulars and other discovery devices. State v. Ford, 349 So.2d 300 (La.1977); State v. Pichler, 355 So.2d 1302 (La.1978); State v. Hamilton, 334 So.2d 383 (La.1976).
[3] LSA-C.Cr.P. art. 716(A) also authorizes the defendant to inspect recorded testimony of the defendant before the grand jury.
[4] Chester Golden testified that Martin told him that when he (Martin) knocked at the trailer, someone answered the door and he asked if he could talk to Todd. Once inside, Golden related, Martin said Todd came to greet him from another room. We note that Pamela Wilson testified that Martin told her that when he went to the door Todd answered the door and allowed him to enter. Golden's testimony is consistent with other facts established by the evidence: that Todd had a woman living with him in the trailer and that approximately two hours before Martin visited the trailer, his wife had gone to the door and a woman had answered. Wilson's ability to recall her conversation with Martin was called into question by defense counsel who solicited testimony that Wilson had been drinking and smoking marijuana prior to her conversation with Martin. However, even if we were to assume that Martin was unaware that others were in the trailer when he entered, we nevertheless believe that in light of the other facts our analysis would be the same.
[*] See, Proffitt v. Florida, in which the Supreme Court qualifiedly approved a construction that a defendant created a great risk of death because he "`obviously murdered two of the victims in order to avoid a surviving witness to the [first] murder.'" 428 U.S. at 256, 96 S.Ct. at 2968, 49 L.Ed.2d at 925, quoting from Alvord v. State, 322 So.2d 533, 540 (Fla.1975).