505 So.2d 702 (1987)
STATE of Louisiana
v.
Glen WEILAND.
No. 86-KA-1726.
Supreme Court of Louisiana.
April 6, 1987.
Rehearing Denied May 7, 1987.
William J. Guste, Jr., Atty. Gen., John Mamoulides, Dist. Atty., Eric Honig, William Credo, Dorothy Pendergast, Asst. Dist. Attys., for plaintiff-appellee.
Philip O'Neill, Gretna, for defendant-appellant.
WATSON, Justice.
In this capital case, counsel for defendant, Glen Weiland, argues seventy-one trial errors. The serious issues are:

*703 (1) Whether the trial court erred in refusing to allow certain mitigating evidence, in particular, the last words of provocation allegedly uttered by the victim; and
(2) Whether the death penalty is a disproportionate sanction for this crime.
At trial, there was no question that defendant was guilty of killing Ida Baudoin. The questions for the jury to decide were the degree of culpability and the appropriate punishment. As to guilt, the jury had to decide whether Glen Weiland had a specific intent to kill or inflict great bodily harm upon more than one person[1] and, if he did, whether the offenses had been committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.[2] In sentencing, the jury had to weigh Glen's thirty-two law abiding, non-violent years against a serious stabbing injury to Paul Sahuque and the stabbing death of Ida Baudoin.[3]

FACTS
A hard working, easy going man with no history of violent or criminal behavior, Glen Weiland is the baby of five brothers and one sister. He had a normal childhood, joining the Cub Scouts and attending the Pentacostal Church four or five times a week. In 1970, at the age of sixteen, he dropped out of high school after finishing the tenth grade. Starting as a laborer, Glen advanced to pipefitter, and then "pusher".[4] Between 1970 and 1972, Glen had his first and only serious girlfriend prior to Ida Baudoin. Glen's father was an alcoholic, and Glen, evidently realizing he had the same problem, voluntarily entered F. Edward Hebert Hospital for treatment in 1980. The treatment apparently arrested the disease, because there is no evidence of any intervening problems with alcohol. On the contrary, Glen enjoyed an excellent reputation, worked with handicapped children and did babysitting for his nephews and nieces. Timid and shy with girls, Glen lived at home with his mother until her death from cancer in 1982. Always described as close to his mother, Glen undertook much of her care during the terminal illness.
In mid-August of 1985, at the age of thirty-two, Glen met Ida Baudoin and subsequently fell in love. Ida had borne three illegitimate children by Paul Sahuque,[5] ages four, two, and one, but they had been in foster care for fourteen months, wards of the state. Glen and Ida commenced living together two weeks after they met. This was the first time Glen had ever lived with a woman. He assured a social worker he wanted to marry Ida and make a home for the children. Even Paul Sahuque, undoubtedly a hostile witness, admitted believing that Glen was deeply in love with Ida. A wedding date was discussed, December 3rd, Ida's birthday. Before Ida, *704 Glen had never proposed marriage to anyone.
There were problems in the relationship. Unbeknownst to Glen, Ida was still "dating"[6] Paul once a week and had sex with him on those occasions. She remained gone overnight on Friday, October 18th. Concerned about her, Glen waited outside all night long. When Ida returned with bruises and handprints on her body, she claimed she had been raped. Glen was uneasy about the matter. Ida refused to let him call the police and said they had been notified, but she would not show him any papers. Ida had, in fact, been with Paul.
On Thursday, around October 24th, Ida disappeared. Glen did not know her whereabouts for three days. She reappeared and their life resumed. On Monday, October 28, 1985,[7] Glen's job was rained out, and he returned home early. Ida's sister, Cheryl, and Cheryl's boyfriend, who lived together upstairs, were beating on the door of his locked apartment. Ida finally answered the door in a state of disarray. The owner of the Yorktown Apartment complex, Robert Walters, was inside. There was a factual dispute about whether Robert was naked or clothed in shorts. He had been inside about forty-five minutes.
Ida told Glen she was "loaded"[8] and had "paid the rent."[9] Glen went to confront Robert, who denied anything had happened. Ida and Glen had a heated argument which escalated into a fight. Ida was severely beaten by Glen who departed with the remainder of a bottle of bourbon left by Robert and proceeded to get drunk. The police came but refused to accept charges against Glen because Ida was so drunk.
Following the advice of an older brother, Glen called the police, intending to turn himself in if there were any charges against him; Glen said the police laughed at him. Meanwhile, Ida had left the apartment, leaving her sister Cheryl a note: "Cheryl, I went somewhere with Robert, the owner, because Glen beat me. I am very hurt. Love, your sister, Ida."[10] When Glen returned, he left a note[11] of apology with Cheryl which said:
"Ida
"I still love you baby. Baby It's all up to you now. If you want a relationship with me let me know. Baby I'm sorry for beating you this way but please talk to me. Baby if you want to whore around let me know. But baby tell me this. You was caught tongt (sic) You even admitted it. Don't make me look like a (sic) ass after I'm out there wondering where you are. I sold my T.V. which I didn't want to. Baby I got to go Please talk to me. You shouldn't have told me you went to bed with Robert. "I got to go baby. Please talk to me Later. I Still Love You Glen."
Ida spent the night with another sister. Still drinking and looking for her, Glen walked from Harvey to Gretna on a cold and rainy night. About 2:30 A.M., he arrived soaking wet at the home of Ida's parents and spent the remainder of the night in an old car parked in front of their home.
On the following morning, Tuesday, October 29, 1985, Glen returned to the Yorktown apartments intending to move out. Glen told manager Emmit "Buddy" Lary he was going to leave because his relationship with Ida was finished. He sold some of his furniture, including a couch, to Dorothy Starleigh, the manager's "wife". While the couch was being moved, a bayonet was discovered under the pillows and Glen was very happy to find his father's souvenir of World War II.
At Ida's request, Sahuque had arrived at the apartment complex between 5:30 and *705 6:30 P.M. Ida Baudoin told Paul that she would like to return to him, but Paul, although he loved her, said that she should get a job and go back to living with her parents before they considered a reconciliation.
In the office of manager Buddy Lary, Dorothy Starleigh told a small group, including Glen and the postman that Paul and Ida were going to put a deposit on Glen's apartment. This conversation occurred thirty minutes to an hour before the homicide and was not particularly directed at Glen.
Glen complained to Postman Richard Johnson that he was mad at Ida. Manager Lary had also told Johnson the two were having problems. Glen had been drinking; his words and walk were slightly impaired.[12] Glen was very upset and threatened to kill Ida. Glen was described as shaking with anger.[13] They had two brief conversations with a fifteen minute interval. Glen complained that he thought Ida had slept with the manager of the apartment complex. When Glen walked away, he appeared somewhat calmer.
Glen testified he talked to Ida Baudoin shortly before her murder. While he was washing clothes and preparing to move, Ida's brother-in-law brought her home. The police came and asked if there was going to be any trouble, and Glen said no. After the police left, Ida came downstairs and asked Glen for a reconciliation. Glen told her no and said Ida got violent and angry, telling him "I never ...".[14] The testimony as to what Ida said was excluded by the trial court as hearsay. At both stages of trial, guilt and punishment, this evidence was excluded. A proffer of the statement was made. It was "that's all right. I never loved you anyway. I was just using you to get my children back." [15]
Glen Weiland subsequently testified that Ida made him feel "used"[16] and the things she told him "just tore my heart out like." [17] Glen took two loads of Ida's laundered clothes upstairs to Cheryl's apartment. On a third trip, he told Ida and Paul that the apartment manager wanted to see them. He remembered he and Paul both having their hands on "the knife", and then Buddy Lary yanking "the knife" out of his hand. He could not recall the intervening events. When Glen realized that he had killed Ida, he went upstairs to commit suicide.
Dr. Kenneth Ritter, an expert in psychiatry, testified that Glen Weiland's period of memory loss was not unusual because people commonly try to forget the most painful parts of their lives. Dr. Ritter was not allowed to testify as to Glen's mental state at the time of the homicide, but admitted that, in his opinion, Glen was not insane and understands right from wrong.
Paul was stabbed in the back, and subsequently saw Glen running behind Ida and stabbing her. Paul managed to pull Glen free from Ida, whereupon Glen attacked Paul again. This second encounter did not cause any serious injury to Paul, and Buddy pulled the bayonet away. Paul passed out and woke up in the hospital where he had his lung sewed together. He remained in intensive care for a day and left the hospital eight or nine days later.
A resident of apartment building 810, Rossano "Ross" Starleigh,[18] heard screaming and observed defendant stabbing Ida Baudoin. Buddy fought for the bayonet, *706 and twisted it out of Glen's hands. Ross was not aware that Paul had been stabbed. One of the seven stabbing wounds in Ida Baudoin's left upper chest penetrated the aorta and caused her death from exsanguination. She died enroute to the hospital.
At approximately 6:30 P.M., Ida Baudoin and Paul Sahuque were found by sheriff's deputies in the breezeway between Glen and the manager's apartments. On the floor was a carpenter's belt containing tools, a small hooked knife which belonged in the belt, clothing, and blood. The belt, tools, and knife belonged to Paul Sahuque.
Defendant was squatting in the bathroom of a vacant upstairs apartment covered with blood. There was a light cut across his neck and more than five cuts on each arm. He was completely passive. There was a kitchen steak knife on the floor. Defendant kept saying, "I had to do it. She cheated on me."[19] He was brought out by the police screaming that he wanted to kill himself. When Glen saw Cheryl standing in the doorway, he went into hysterics screaming "I hope the bitch is dead,"[20] and had to be restrained. Glen also threatened Cheryl's life.
Glen was treated at Charity Hospital where he remained for six or seven hours while he had some stitches and got his hands wrapped. He did not remember telling Cheryl that he was going to kill her too, but did not deny that he killed Ida Baudoin and stabbed Paul Sahuque.

IMPROPER EXCLUSION OF MITIGATING EVIDENCE:

The Words of Provocation Uttered by the Victim Shortly Before the Crime
During the course of the opening statement on behalf of defendant, hearsay objections were sustained as to what the deceased, Ida Baudoin, had told defendant during the course of their relationship.
During trial, the same testimony was excluded. Glen testified he talked to Ida Baudoin shortly before her murder. After Glen refused a reconciliation, Ida allegedly got violent and angry, telling him "I never...".[21] At both stages of the bifurcated trial, the testimony as to what Ida said was excluded by the trial court as hearsay. A proffer of the statement was made. It was "that's all right. I never loved you anyway. I was just using you to get my children back."[22]
Utterances which circumstantially indicate a particular state of mind are not hearsay because the truth of the statement is not at issue. See 6 Wigmore, Evidence § 1790.
State v. Raymond, 258 La. 1, 245 So.2d 335 (1971) recognizes that an out-of-court statement offered to prove circumstantially the declarant's emotional attitude toward a defendant is not hearsay, pointing out that this type of evidence is particularly essential in a homicide case where the victim is unavailable to testify.
In State v. Shoemaker, 500 So.2d 385 (La.1987), defendant was not allowed to testify as to what a criminal deputy had told him, evidence which supported his entrapment defense, and the conviction and sentence were reversed.
"[A]n essential component of procedural fairness is an opportunity to be heard. In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507-508, 92 L.Ed. 682 (1948); Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). That opportunity would be an empty one if the state were permitted to exclude competent, reliable evidence.... In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and `survive the crucible of meaningful adversarial testing.' United States v. Cronic, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984). See also Washington v. Texas, supra, 388 U.S. [14], at 22-23, 87 S.Ct. [1920], at 1924-1925 [18 L.Ed.2d 1019 (1967)]." Crane v. *707 Kentucky, ___ U.S.___, at ___, 106 S.Ct. 2142 at 2146-2147, 90 L.Ed.2d 636 at 645 (1986).
It is well established that the defendant in a capital case must be allowed to place before the sentencing jury all relevant evidence in mitigation of punishment. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, ___ U.S. ___, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Crane, supra. "[E]xclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." Skipper, supra, ___ U.S. at___, 106 S.Ct. at 1673, 90 L.Ed.2d at 9.
Testimony as to Ida's statement shortly before the homicide was critical to this defendant's manslaughter defense. By restricting evidence bearing on that defense, the trial court clearly erred and the erroneous ruling deprived defendant of a fair trial. Shoemaker, supra.

PROPORTIONALITY
The Supreme Court of Louisiana is required to review each death sentence to determine if it is excessive.[23] One of the guidelines for that review is whether the sentence is disproportionate to that imposed in similar cases, considering both the crime and the defendant.[24] Comparative proportionality review is not a federal constitutional requirement,[25] but the penalty cannot be disproportionate to the crime. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
The "eye for an eye" principle would justify a death sentence in every case in which a human life is taken. However, a mandatory death penalty has been declared unconstitutional with the possible exception of a murder by a prisoner serving a life sentence. Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Gregg v. Georgia, supra; Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The death penalty can only be imposed under standards which insure it is not a wanton and discriminatory sanction. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). It must be confined to those cases where it is particularly appropriate. Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
In general, a death penalty can constitutionally be imposed only when: (1) the murder is particularly horrible and shocking, as when the victim is tortured; or (2) the murder is committed in connection with another crime, such as armed robbery, which tears at the basic fabric of society; or (3) the murder victim is one deserving of special protection, as in the case of a police officer; or (4) the murderer is a convicted or imprisoned felon; or (5) the murder was committed for a price or to suppress evidence from the victim.[26]
*708 Falling into the first category of crimes, those that are particularly shocking to a person of ordinary sensibility, are mass murders, where many people are indiscriminately endangered or killed. This is recognized by the Model Penal Code which lists as an aggravating circumstance the fact that defendant knowingly created a great risk of death to many persons.[27]
Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) upheld a death sentence where an aggravating factor was a great risk of death to many persons because there were five attempts to select a random victim before one was finally chosen and killed. The California statute considered in Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) had as an aggravated circumstance multiple murders. In contrast to the Model Penal Code, the Florida statute considered in Barclay, and the California statute involved in Pulley, the Louisiana statute lists as an aggravating circumstance a risk of death or bodily harm to more than one person.[28] The Louisiana statute does not require multiple murders or risk of death to "many persons".
In Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), Godfrey killed his wife and mother-in-law with two shotgun blasts. A state court finding that the murders were outrageous and wantonly vile was found to be the result of a jury's uncontrolled discretion, and the death sentence was vacated. Godfrey pretermitted the question of whether a death sentence could have been imposed if the Georgia statute had had multiple murders as an aggravating circumstance.[29]
Granting that causing risk of death or great bodily harm to more than one person is sufficient as an aggravating circumstance to justify the death penalty, this death sentence seems disproportionate to those imposed in other Jefferson Parish homicides. Defendant is a thirty-two year old male with no criminal record and a law-abiding background. After finding that his live-in girlfriend had been unfaithful, an alcoholic in remission went on a lengthy drunk. While he was intoxicated, the girlfriend told him that she had never loved him and was merely using him to get her three children back from state custody. After a short period of brooding about this remark, defendant took his father's bayonet, stabbed his girlfriend seven times, and the father of her three children, Paul Sahuque, once. Although Sahuque was seriously injured, he did not die. According to the Capital Sentence Review memorandum submitted by the state, this is not the type of case in which a Jefferson Parish jury has ever given a death penalty.[30]
*709 In State v. Smith, 400 So.2d 587 (La. 1981) multiple shots were fired at a group of three men and one man died from a gun shot wound in the back. Smith was found guilty of first degree murder and sentenced to death for creating a risk of death or great bodily harm to more than one person, but he died of natural causes. His death sentence was not affirmed prior to his death. The case was remanded because of uncertainty regarding Smith's specific intent to kill or harm the other two men and the factual issue of provocation. Although the same aggravating circumstance was present in Smith, the trial transcript shows a random killing, not a crime of passion.
State v. Lowenfield, 495 So.2d 1245 (La. 1985) presents the closest analogy to Weiland's situation: the only affirmed aggravating circumstance was risk of death or great bodily harm to more than one person. Five family members were shot by a former lover of one of the victims. However, the relationship between the defendant and victim Sheila Thomas had ended several months before the crime. Defendant had harassed his former girlfriend with obscene telephone calls and repeatedly told other people that he was going to kill Sheila as well as her mother. Approximately two months after the break-up with Sheila, Lowenfield killed Sheila Thomas; her mother, Myrtle Griffin; her stepfather, Owen Griffin; her four year old daughter, Shantell Osborne; and the father of the child, Carl Osborne.
Unlike this defendant who showed immediate remorse and attempted suicide, Lowenfield escaped to New York City and denied ever being in Louisiana. The killings resulted from deliberate planning over a period of time and included among the five victims a four year old child. The murders wiped out an extended family, which spanned three generations. Although not an aggravating circumstance when Lowenfield committed his homicide on August 30, 1982, the fact that a victim is under the age of twelve is now a statutory aggravating circumstance.[31] Children, like police officers, are in the category of persons needing special protection.
The mitigating circumstances present here were absent in Lowenfield. Unlike this defendant who had been a law abiding citizen for all of his thirty-two years, Lowenfield had served eighteen months of a two year sentence for aggravated rape in Canada and had also been convicted on a firearm's charge. A psychiatrist described Lowenfield as a very dangerous individual who would be highly likely to commit the same crimes again.
Lowenfield considered two other death sentence cases involving "heat of blood" crimes: State v. Welcome, 458 So.2d 1235 (La.1983) and State v. Martin, 376 So.2d 300 (La.1979).
In Welcome, defendant argued with his aunt's lover over a pocket knife, began shooting at the lover, and when the man fled chased him down and shot him several more times. Welcome then returned to the *710 house, taunted his aunt, and reloaded the gun. The aunt fled. Welcome chased her down and killed her. Welcome involved the cold-blooded killing of two people after an argument over an insignificant matter. The victims were pursued to their deaths, and Welcome lacks the elements of passion and provocation which are present here. The United States Fifth Circuit Court of Appeal affirmed Welcome's conviction and sentence,[32] noting that an extensive proportionality review had been done in State v. Welcome,[33] which went beyond the requirements of the Louisiana statute. The Welcome opinion notes the significant time lapse between the initial scuffle and the shooting of the first victim, a second significant time lapse before the second shooting, and the deliberate execution of the second victim while she begged for mercy after Welcome had reloaded his gun and chased her down. Welcome concluded, after a survey of all first degree murder convictions involving multiple killings since 1976, that juries have generally recommended the death penalty "when two or more persons were actually killed in a single act or a single consecutive course of conduct." 458 So.2d 1235 at 1255. However, see State v. Sharp, 418 So.2d 1344 (La.1982) where defendant received life imprisonment after killing his estranged wife's brother and sister-in-law. Here, of course, there was only a single killing, and Sahuque's injury, while serious, was not fatal.
In Martin, the defendant fatally shot his wife's lover, Bobby Todd, and three female witnesses, firing fifteen shots and reloading his pistol twice. Although there were some mitigating circumstances, Martin had plotted the killing of Todd for at least two days. Three Louisiana Justices dissented from affirming Martin's death sentence on the ground that it was excessive, noting: (1) there was no significant history of prior criminal activity; (2) Martin acted under extreme emotional disturbance; and (3) Martin reasonably believed he had some moral justification. Martin's crimes were much more those of a cold-blooded killer than Weiland's crimes. The killing of three unrelated bystander-witnesses would alone make Martin a more culpable defendant.
The heat of passion factor is much more prominent here than in Welcome and Martin. There was no significant time lapse between the killing and the injury to Paul Sahuque. The evidence in Welcome of a continuing danger to society is not present here. The evidence indicates Weiland, an alcoholic in remission, committed a crime of passion in the heat of anger and drunkeness after a short period of brooding. "[T]here are murderers, such as those who act in passion, for whom the threat of death has little or no deterrent effect." Gregg v. Georgia, 428 U.S. 153 at 185, 96 S.Ct. 2909 at 2931, 49 L.Ed.2d 859 at 881 (1976).
Unlike the Lowenfield, Welcome, and Martin cases, the penalty imposed here appears disproportionate to that imposed in similar cases. However, the conviction and sentence must be reversed because of the trial court's erroneous exclusion of crucial mitigating evidence at both stages of trial.
For the foregoing reasons, the conviction and sentence are reversed, and the case is remanded for a new trial.
REVERSED AND REMANDED.
CALOGERO, J., concurs agreeing that by restricting evidence bearing on defendant's manslaughter defense the trial court committed reversible error, but being of the view that it is consequently unnecessary to address the issue of proportionality.
DENNIS, J., concurs but does not totally agree with the description of the Welcome and Martin cases, although they are distinguishable from this case in some respects.
LEMMON, J., concurs and assigns reasons.
MARCUS, J., dissents and assigns reasons.

*711 APPENDIX
In State v. Marse, 365 So.2d 1319 (La., 1978), defendant killed a police officer who was attempting to intervene on behalf of Marse's former girlfriend and was found guilty of manslaughter. State v. Andrews, 369 So.2d 1049 (La., 1979), involved a teenager who fatally stabbed another teenager and was sentenced to life imprisonment. In State v. Kevin and Sheldon Manieri, 378 So.2d 931 (La., 1979), defendants killed an eleven year old girl and were sentenced to life imprisonment. In State v. Love, 410 So.2d 1045 (La., 1982) a circumstantial evidence case, defendant was found guilty of a first degree shooting murder and sentenced to life imprisonment. After the conviction and sentence were reversed, Love pled guilty to manslaughter.
In State v. Berry, 391 So.2d 406 (La., 1980), cert. den., 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981), a policeman on duty as a security guard was shot and killed during a bank robbery and Berry was sentenced to death. In State v. Wilson and Moses, 404 So.2d 968 (La., 1981), the black defendants were involved in an inter-racial confrontation with a group of white men. Defendants were sentenced to life imprisonment for the first degree murder of one of the white men, which occurred after several shots were fired. The convictions and sentences were reversed, and after remand, both defendants pled guilty to manslaughter and were sentenced to thirty-seven years at hard labor. State v. Wilson, 441 So.2d 357 (La.App. 5 Cir. 1983).
In State v. Raymond, 412 So.2d 107 (La., 1982) a store owner was mortally shot during an armed robbery and the store clerk was also shot. Raymond was sentenced to life imprisonment for murder while engaged in a felony with intent to kill more than one person. State v. Lane, 414 So.2d 1223 (La., 1982) involved an extremely vicious and atrocious murder in the course of which the victim was beaten, raped, mutilated and burned. Defendant Lane was sentenced to life imprisonment. His co-defendant, Sawyer, was sentenced to death, the aggravating circumstances being aggravated arson, conviction of an unrelated murder and heinousness. State v. Sawyer, 422 So.2d 95 (La., 1982), cert. granted, 463 U.S. 1223, 103 S.Ct. 3567, 77 L.Ed.2d 1407 (1983); on remand, 442 So.2d 1136 (La., 1984), cert. den., 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984).
State v. Lindsey, 404 So.2d 466 (La., 1981), after remand, 428 So.2d 420 (La., 1983), cert. den., 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983), reh. den., 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983) involved a shooting death during the course of a robbery. Lindsey was sentenced to death and the sentence was affirmed, but the United States Fifth Circuit Court of Appeal reversed and remanded for retrial. Lindsey v. King, 769 F.2d 1034 (5 Cir., 1985), reh. den., 775 F.2d 301 (5 Cir., 1985).
State v. Sharp, 418 So.2d 1344 (La., 1982), involved a marital argument between Sharp and his estranged wife, during the course of which defendant stabbed to death both his wife's brother and sister-in-law. Sharp was convicted of first degree murder and sentenced to life imprisonment. In State v. Goza, 408 So.2d 1349 (La., 1982), the state convinced a jury that defendant Goza had hired someone to kill her husband. Goza was found guilty of first degree murder and sentenced to life imprisonment, but the conviction and sentence were reversed, the matter remanded and the case dismissed after remand. State v. Tuckson, 414 So.2d 360 (La., 1982) involved a shooting death during the course of a truck robbery. Defendant Tuckson was convicted of first degree murder and sentenced to life imprisonment, but the conviction was reversed and the case remanded for entry of a second degree murder verdict with affirmance of sentence.
In State v. Robinson, 421 So.2d 229 (La., 1982), defendant, while robbing the Waites' home, killed Mr. Waites and threatened the life of Mrs. Waites. Robinson was sentenced to death, the jury finding that he was engaged in the prepetration of aggravated burglary, had a significant prior history of criminal activity, knowingly created *712 a risk of death or bodily harm to more than one person, committed an especially heinous murder, and the victim was an eye-witness to a crime alleged to have been committed by the defendant. The conviction was affirmed, but the sentence was set aside and the matter remanded for a new sentencing hearing, after which defendant was sentenced to life. State v. Stewart, 437 So.2d 872 (La., 1983) involved Robinson's co-defendant who was found guilty of second degree murder and sentenced to life imprisonment.
In State v. Taylor, 422 So.2d 109 (La., 1982), cert. den., 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983), defendant was convicted of a heinous murder during the course of an armed robbery. His conviction and sentence of death were affirmed on October 18, 1982, and defendant was executed.
State v. Smith, 416 So.2d 1301 (La., 1982), involved a defendant who broke into a home and shot to death a neighbor who came to the scene. Smith was convicted of second degree murder and sentenced to life imprisonment. In State v. Parks, 422 So.2d 1164 (La., 1982), defendant's boyfriend killed her husband under an agreement that they would split the proceeds of the husband's insurance policy. Defendant Parks was convicted of second degree murder and sentenced to life imprisonment. State v. Carbo, Docket No. 80-3493, Twenty-Fourth Judicial District Court, Parish of Jefferson, was the prosecution of Sabrina Parks' lover who pled guilty to second degree murder and was also sentenced to life imprisonment.
In State v. Dupeire, 420 So.2d 687 (La., 1982), defendant was convicted of second degree murder after shooting a motel manager during the course of an armed robbery. State v. Mangerchine, Docket No. 81-573, Twenty-Fourth Judicial District Court, Parish of Jefferson, involved Dupeire's co-defendant who pled guilty to manslaughter and armed robbery under a plea bargain arrangement; he testified that Dupeire actually shot the victim. Mangerchine was sentenced to twenty-one years at hard labor.
State v. Billiot, 421 So.2d 864 (La., 1982) was a heinous killing during which the victim of an armed robbery was cut, stabbed, beaten, knifed, and drowned. Billiot was convicted of second degree murder and sentenced to life imprisonment. Billiot's accomplice, John Shilling, was convicted of first degree murder and sentenced to life imprisonment. State v. Shilling, 440 So.2d 110 (La., 1983).
State v. Nelson, 459 So.2d 510 (La., 1984), cert. den., 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985); reh. den., 472 U.S. 1013, 105 S.Ct. 2715, 86 L.Ed.2d 729 (1985) involved the murder and robbery of a transvestite under somewhat bizarre circumstances. Nelson was convicted of first degree murder and sentenced to death on the ground that he was engaged in the perpetration of an armed robbery at the time of the murder. The conviction and sentence were affirmed.
State v. Cruz, 455 So.2d 1351 (La., 1984) was a case in which a young woman was robbed and killed shortly before her marriage. Cruz was convicted of first degree murder and sentenced to life imprisonment.
State v. Flowers, 441 So.2d 707 (La., 1983), cert. den., 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984) involved the brutal murder of a seventy year old victim during the course of a rape and burglary. Flowers was convicted of first degree murder and the jury recommended a death sentence. Both the conviction and sentence were affirmed, but the United States Fifth Circuit Court of Appeal reversed and remanded for a new trial. Flowers v. Blackburn, 779 F.2d 1115 (5 Cir., 1986), cert. den., ___ U.S. ___, 106 S.Ct. 1661, 90 L.Ed.2d 204 (1986). Defendant was subsequently found guilty of first degree murder and sentenced to life imprisonment.
State v. Butler, 462 So.2d 1280 (La.App. 5 Cir.1985) considered the random murder of a bar patron in a parking lot. Defendant Butler, angry because he had been refused service at the bar, also fired three more shots as he was leaving the bar parking lot and hit another person in the leg. Butler was convicted of first degree murder and sentenced to life imprisonment, *713 because he intended to kill or harm more than one person.
In State v. Patterson, 464 So.2d 811 (La. App. 5 Cir.1985), the victim was stabbed by either one or two hitchhikers and robbed of her car. Patterson was convicted of second degree murder and sentenced to life imprisonment. The other hitchhiker, Roy McFall, was convicted of first degree murder and sentenced to life imprisonment. State v. McFall, 464 So.2d 845 (La.App. 5 Cir.1985).
State v. Washington involved a shooting killing during the course of a dice game. Washington was convicted of second degree murder and sentenced to life imprisonment. The conviction and sentence were affirmed in an unpublished opinion by the Court of Appeal, Fifth Circuit, [Docket No. 84-KA-586] on April 15, 1985.
In State v. Dean, 487 So.2d 709 (La.App. 5 Cir.1986), writ den., 495 So.2d 300 (La., 1986), a young man who shot his mother and sister was found guilty of first degree murder and sentenced to life imprisonment.
In State v. Medford, 489 So.2d 957 (La. App. 5 Cir.1986), Medford and Kenneth McCullough forced their way into the home of Mr. and Mrs. Plaisance and their two children. When a neighbor and his son came to the aid of the Plaisance family, Medford fired three shots at the son and two that hit the father. Although McCullough fired the fatal shot at the father, Medford was also found to have a specific intent to kill or inflict great bodily harm on more than one person. Medford was convicted of first degree murder and sentenced to life imprisonment.
LEMMON, Justice, concurring.
I agree that the conviction and sentence must be reversed because the trial judge excluded admissible evidence offered in mitigation of defendant's conduct. If this evidence had been allowed, the jury might have returned a verdict of manslaughter. However, I expressly decline to subscribe to the dicta concerning the role of proportionality review in Louisiana's capital sentencing system or to the unnecessary proportionality review in this case.
MARCUS, Justice (dissenting).
Even if the trial court erred in not permitting defendant to testify that the victim told him "that's all right. I never loved you anyway. I was just using you to get my children back," defendant did testify that she had "said something bad to him" which made him feel "[r]eally hurt like she had used [him] for a fool" and that he was "tore up" by her callous remarks. Hence, the jury heard substantially what the victim told him. Moreover, the facts show that in the hour between the remarks and the killing, defendant acted calmly and rationally, making trips to the laundry, to the manager's apartment, and to the victim's sister's apartment. Given these facts, the jury could reasonably have concluded that the victim's remarks notwithstanding the defendant's blood had cooled prior to the killing. Therefore, the error of the trial court in excluding some of the remarks of the victim was harmless. La.Code Crim.P. art. 921.
I further dissent from the majority's holding that the sentence of death in this case is disproportionate to that in other cases. Inasmuch as the death penalty has been imposed in other "crimes of passion" where the defendant put more than two people at risk of death, or great bodily harm, see, e.g., State v. Lowenfield, 495 So.2d 1245 (La.1985), I see no reason to distinguish this case based on the numbers involved since the statute proscribing first degree murder defines that crime as simply "the killing of a human being [w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person [.]" (Emphasis supplied.) Moreover, comparative proportionality review is not a federal constitutional requirement. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).
Accordingly, I respectfully dissent.
NOTES
[1] LSA-R.S. 14:30 provides in pertinent part:

"A. First degree murder is the killing of a human being:
* * * * * *
"(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or
* * * * * *
"C. Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury."
[2] LSA-R.S. 14:31 provides in pertinent part: "Manslaughter is:

"(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool relection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or * * *"
[3] As the jury concluded, the murder was not heinous, i.e., shockingly evil, in the sense that the word is used in capital cases.
[4] Tr. 1072.
[5] Sahuque had pled guilty or been convicted of five criminal offenses and had spent thirteen to eighteen months in a federal penitentiary.
[6] Tr. 547.
[7] Glen claims this date was Friday, October 25th, but the other witnesses generally agree on Monday, October 28th.
[8] Tr. 794.
[9] Tr. 794.
[10] Tr. 684 reflects the contents of this note, as corrected by Cheryl.
[11] Exhibit D-2.
[12] At sentencing, the prosecutor erroneously told the jury: "[t]he only evidence presented of any intoxication was presented by the defendant," (Tr. 1084) and "... that the defendant was intoxicated at the time. Again, no other evidence to corroborate that other than what the defendant himself offers." (Tr. 1085)
[13] The prosecutor also told the jury: "[T]here was no other independent evidence of the fact that the defendant might've been under an emotional impairment other than what he offered." (Tr. 1085)
[14] Tr. 802.
[15] Tr. 810.
[16] Tr. 815.
[17] Tr. 815.
[18] He was living there with the apartment manager and his mother.
[19] Tr. 476.
[20] Tr. 477.
[21] Tr. 802.
[22] Tr. 810.
[23] LSA-C.Cr.P. art. 905.9 provides:

"The Supreme Court of Louisiana shall review every sentence of death to determine if it is excessive. The court by rules shall establish such procedures as are necessary to satisfy constitutional criteria for review."
[24] Rule 28, Supreme Court.
[25] Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).
[26] LSA-C.Cr.P. art. 905.4 provides:

"The following shall be considered aggravating circumstances:
"(a) the offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or simple robbery;
"(b) the victim was a fireman or peace officer engaged in his lawful duties;
"(c) the offender has been previously convicted of an unrelated murder, aggravated rape, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or aggravated kidnapping;
"(d) the offender knowingly created a risk of death or great bodily harm to more than one person;
"(e) the offender offered or has been offered or has given or received anything of value for the commission of the offense;
"(f) the offender at the time of the commission of the offense was imprisoned after sentence for the commission of an unrelated forcible felony;
"(g) the offense was committed in an especially heinous, atrocious, or cruel manner; or
"(h) the victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant.
"(i) the victim was a correctional officer or any employee of the Louisiana Department of Corrections who, in the normal course of his employment was required to come in close contact with persons incarcerated in a state prison facility, and the victim was engaged in his lawful duties at the time of the offense.
"(j) the victim was under the age of twelve years.
"For the purposes of Subparagraph (b) herein, the term peace officer is defined to include any constable, marshal, deputy marshal, sheriff, deputy sheriff, local or state policeman, game warden, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge, attorney general, assistant attorney general, attorney general's investigator, district attorney, assistant district attorney, or district attorney's investigator."
[27] American Law Institute, Model Penal Code, § 210.6(3)(d).
[28] LSA-C.Cr.P. art. 905.4(d) provides:

The following shall be considered aggravating circumstances:
* * * * * *
"(d) the offender knowingly created a risk of death or great bodily harm to more than one person; * * *"
[29] See Footnote 15 of Godfrey.
[30] See the Appendix attached to and made a part of this opinion.
[31] Act 515 of 1985 provides:

"To enact R.S. 14:30(5) and Code of Criminal Procedure Art. 905.4(j), relative to the crime of first degree murder and circumstances to be considered in a sentencing hearing following a conviction for a capital crime; to provide that killing a human being under the age of twelve years with specific intent to kill or do great bodily harm to such victim is first degree murder; to include as an aggravating circumstance in a sentencing hearing following conviction of a crime for which a death sentence may be imposed the circumstance of the victim being under the age of twelve years; and to provide for related matters. "Be it enacted by the Legislature of Louisiana: "Section 1. R.S. 14:30(5) is hereby enacted to read as follows:
"§ 30. First degree murder
"First degree murder is the killing of a human being:
* * * * * *
"(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve years.
* * * * * *
"Section 2. Code of Criminal Procedure Art. 905.4(j) is hereby enacted to read as follows: "The following shall be considered aggravating circumstances:
* * * * * *
"(j) the victim was under the age of twelve years."
[32] Welcome v. Blackburn, 793 F.2d 672 (5th Cir., 1986).
[33] 458 So.2d 1235 (La.1983).